DONALD WANHA AND LEE WANHA, HUSBAND AND WIFE, APPELLEES, V. ROBERT LONG AND JOLANE K. OLANDER LONG, HUSBAND AND WIFE, APPELLANTS, AND AMERUS BANK, A CORPORATION, APPELLEE.

587 N.W. 2d 531

Filed December 31, 1998. No. S-97-808.

850

Richard N. Berkshire and Steffanie N. McCarthy, of Andersen, Berkshire, Lauritsen & Brower, for appellants.

John M. Lingelbach, of Marks Clare & Richards, for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CONNOLLY, J.

Appellees Donald Wanha and Lee Wanha own property abutting the property of appellants, Robert Long and Jolane K. Olander Long. The Wanhas brought a quiet title action against the Longs, claiming adverse possession of a portion of the Longs' property, and the Wanhas prevailed. The Longs assert that the trial court erred in finding that the Wanhas adversely possessed the disputed property and that the Wanhas' alleged

adverse possession conflicts with Neb. Rev. Stat. § 14-116 (Reissue 1997), which regulates subdividing and platting. We conclude that the trial court did not err in finding that the Wanhas had adversely possessed the disputed property and that § 14-116 does not apply to the instant case. We affirm.

## I. BACKGROUND

### 1. OWNERSHIP OF LOTS 104 AND 105
### AND DESCRIPTION OF DISPUTED PROPERTY

The Wanhas purchased Lot 105, in Mockingbird Heights Replat, a subdivision in Douglas County, Nebraska, in 1965 and have owned Lot 105 continuously since. On December 27, 1977, Jolane Olander Long purchased Lot 104 in Mockingbird Heights Replat, which lot abuts the Wanhas' lot on the west. After their marriage, Robert Long moved into the house on Lot 104 in 1980 to live with Jolane Olander Long, but he did not acquire an interest in Lot 104 until February 15, 1996. Lot 104's chain of title from 1964 until Jolane Olander Long purchased it in 1977 is as follows: 1964 to 1966, Pacesetter Corporation; 1966 to 1968, Robert and Marie Yochim; 1968 to 1973, Victor and Catherine Brown; 1973 to 1975, Richard and Maureen Shannon; 1975 to 1977, Billy and Anita Holman.

Orchard Avenue runs along the north side of the lots, which are bounded on the south by other lots. The disputed property is a wedge-shaped piece of land bounded on the east by the true, platted boundary line between Lots 104 and 105. The west boundary of the disputed property, the "disputed property line," runs north from the south post of a fence which was removed in 1996 to a seam in the sidewalk running along Orchard Avenue.

### 2. HISTORY OF DISPUTED PROPERTY

When the Wanhas moved into the home on Lot 105, the lot contained no sod and no sidewalk along Orchard Avenue. However, Lot 104 had sod and a sidewalk alongside Orchard Avenue, both of which stopped short of Lot 104's eastern boundary. Instead, the sod and edge of the sidewalk paralleled the disputed property line. The Wanhas later built a sidewalk along Orchard Avenue, which extended from the edge of the existing sidewalk on Lot 104 to the northeast corner of Lot 105.

The Wanhas also seeded Lot 105 and that portion of Lot 104 up to the western edge of the disputed property. They seeded the disputed property believing that it was part of Lot 105.

Sometime between 1973 and 1974, the Shannons, then owners of Lot 104, built a fence between Lots 104 and 105. The fence ran along the disputed property line from the southern property line of Lot 104 to a point east of the back of the house on Lot 104. The Shannons did not discuss the fence with the Wanhas before installing it. The Wanhas believed that the fence was located on the property line between Lots 104 and 105. The subsequent owners of Lot 104, the Holmans, did not object to the location of the fence, and the Wanhas never discussed the fence with them either. Likewise, Jolane Olander Long never discussed the fence with the Wanhas, nor did she register any concern regarding the fence's location. The fence was not modified in any way until it was removed by Robert Long in 1996.

### 3. ORIGINS OF DISPUTE

In the summer of 1996, Robert Long began constructing a deck behind his house on Lot 104. During the construction of the deck, he removed the fence built by the Shannons. The edge of the deck abutted the former fence line. When he started building the deck, he did not have a permit. A city inspector inspected the deck prior to its completion and told Robert Long that the deck needed to be set back 5 feet from the edge of the Longs' property line. Robert Long asked Donald Wanha whether he would approve a waiver of the 5-foot setback requirement. After asking Donald Wanha to approve a waiver, Robert Long had the property surveyed. Neither the Longs nor the Wanhas knew the location of the platted boundary line until after the survey was taken.

According to Donald Wanha, he first discovered the location of the platted boundary line in the summer of 1996 when he discovered survey flags in the area of the disputed property. Prior to that time, he had always believed that the seam in the sidewalk and the sod line, later the fence line, determined the boundaries between the lots. Robert Long did not know the location of the platted boundary until the survey was taken, but

assumed that the true boundary lay "somewhere between the houses."

After the survey was taken, the Longs and the Wanhas began contesting ownership of the disputed property.

### 4. USE OF DISPUTED PROPERTY

According to Robert Long, Donald Wanha had told him that Donald Wanha cut the grass "about in the middle until the fence was put up." Robert Long had no other evidence as to the use of the disputed property from 1965, when the Wanhas moved in, until 1980, when Robert Long moved in. Robert Long claims that he has mowed and trimmed the disputed property since 1980 and has talked to neighbors while standing on the disputed property. The Wanhas claimed that they used and maintained the disputed property from 1965 until 1996, when Robert Long took the fence down.

The owner of Lot 106 stated that the Wanhas had maintained the disputed property for 30 years, even prior to the installation of the fence by the Shannons. The owner of Lot 106 had never seen Robert Long maintain the disputed property prior to 1996, nor had he seen anyone other than the Wanhas do so. The owner of Lot 107 also stated that he was unaware of anyone other than the Wanhas being in possession of the disputed property during the 30 years he had owned Lot 107.

### 5. TRIAL COURT'S FINDINGS

The trial court found that the Longs' claims were not persuasive. The trial court noted that the Wanhas' claims concerning the original sod line and sidewalk seam were uncontested. The trial court also noted that the fence had remained in place until Robert Long took it down, finding that until that time, the parties recognized the fence line as the true boundary line. Accordingly, the trial court concluded that from 1965 until 1996, the boundary line was the sod/fence line, and that the Wanhas had adversely possessed the disputed property.

The trial court rendered its judgment on April 16, 1997. The Longs then filed a motion for new trial on April 28, which was denied by the trial court on July 1. The Longs filed a notice of appeal on July 30, which resulted in the instant appeal.

## II. ASSIGNMENTS OF ERROR

The Longs assert that the district court erred in (1) finding that the Wanhas had met the requirements for adverse possession of the disputed property for the statutory period when the evidence showed the Wanhas' possession was not actual, continuous, exclusive, notorious, or adverse under a claim of ownership for the full statutory 10-year period and (2) quieting title to the disputed property in the Wanhas, because such order conflicts with § 14-116, the prescribed statutory procedure affecting the plat of real estate.

## III. SCOPE OF REVIEW

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent from the lower court's decision. It not only is within the power but it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *State v. Parmar, ante* p. 356, 586 N.W.2d 279 (1998).

A quiet title action sounds in equity. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Rush Creek Land & Live Stock Co. v. Chain, ante* p. 347, 586 N.W.2d 284 (1998).

Interpretation of a statute presents a question of law. *State ex rel. Garvey v. County Bd. of Comm.*, 253 Neb. 694, 573 N.W.2d 747 (1998).

## IV. ANALYSIS

### 1. JURISDICTION

The Wanhas contend that this court is without jurisdiction to hear the instant appeal because the Longs failed to make a timely appeal. Specifically, the Wanhas argue that since the Longs' motion for new trial was filed 12 days after the judgment was rendered, the 30-day period for filing the notice of appeal was not tolled.

In order to vest an appellate court with jurisdiction, the notice of appeal must be filed within 30 days of the entry of the final order or the overruling of a motion for new trial. *Tri-County Landfill v. Board of Cty. Comrs.*, 247 Neb. 350, 526 N.W.2d 668 (1995). A timely motion for new trial suspends the time limit for filing a notice of appeal, until the motion for new trial has been disposed of by the court rendering the decision. *Manske v. Manske*, 246 Neb. 314, 518 N.W.2d 144 (1994). However, an untimely motion for new trial is ineffectual, does not toll the time for perfection of an appeal, and does not extend or suspend the time limit for filing a notice of appeal. *Id.*

In the instant case, the notice of appeal was filed within 30 days of the order overruling the motion for new trial. Thus, the question is whether the motion for new trial was timely filed such that it effectively tolled the time for perfection of the appeal.

Neb. Rev. Stat. § 25-1143 (Reissue 1995) states: "The application for a new trial must be made, within ten days, either within or without the term, after the verdict, report or decision was rendered . . . ." Neb. Rev. Stat. § 25-2221 (Reissue 1995) prescribes the method for computing the 10-day period:

> [T]he period of time within which an act is to be done in any action or proceeding shall be computed by excluding the day of the act, event, or default after which the designated period of time begins to run. The last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a day during which the offices of courts of record may be legally closed as provided in this section, in which event the period shall run until the end of the next day on which the office will be open.

See *Harsche v. Czyz*, 157 Neb. 699, 61 N.W.2d 265 (1953). Thus, when the 10th day after a judgment is a Saturday or Sunday, a motion for new trial is timely filed on the following Monday. See *Fiala v. Tomek*, 164 Neb. 20, 81 N.W.2d 691 (1957).

In the instant case, the 10-day period ended on April 26, 1997, which was a Saturday. Accordingly, the motion for new trial could be timely filed on the following Monday, which was April 28. The Longs filed their motion for new trial on that date,

and thus, it was timely filed. Because their motion for new trial was timely filed, the time for perfection of their appeal was tolled, and their notice of appeal was likewise timely filed. Therefore, we conclude that this court has jurisdiction to hear the instant appeal.

## 2. ADVERSE POSSESSION

The Longs argue that the Wanhas failed to establish the simultaneous and continuous existence of each element of adverse possession for the requisite period. See *Rush Creek Land & Live Stock Co. v. Chain, ante* p. 347, 586 N.W.2d 284 (1998). A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for the statutory period of 10 years. *Id.*

### (a) Actual

Actual occupancy or possession is always involved in any claim to land by adverse possession. *Thomas v. Flynn*, 169 Neb. 458, 100 N.W.2d 37 (1959). See, also, *Dartmouth College v. Rose*, 172 Neb. 764, 112 N.W.2d 256 (1961). No particular act is required to establish "actual possession." See *Olson v. Fedde*, 171 Neb. 704, 107 N.W.2d 663 (1961). Rather, the acts required depend upon the character of the land and the use that can reasonably be made of it. *Nennemann v. Rebuck*, 242 Neb. 604, 496 N.W.2d 467 (1993). See *Saunders v. Rebuck*, 242 Neb. 610, 496 N.W.2d 472 (1993).

In the instant case, the land was residential in character. In 1965, the Wanhas constructed a sidewalk on and seeded the disputed property. The evidence indicated that from 1965 until 1975, no one other than the Wanhas used or maintained the property. This use and maintenance was not inconspicuous. It is not necessary that a party prove a complete enclosure or that he remain continuously on the land for the statutory period, but only that the land be used continuously for the purposes to which it was by its nature adapted. *Jones v. Schmidt*, 170 Neb. 351, 102 N.W.2d 640 (1960).

We conclude that the Wanhas actually and continuously possessed the disputed property for a period of at least 10 years.

### (b) Exclusive

Possession must be exclusive, and if the occupier shared possession with the title owner, the occupier may not obtain title by adverse possession. *Dugan v. Jensen*, 244 Neb. 937, 510 N.W.2d 313 (1994). Where the record establishes that both parties have used the property in dispute, there can be no exclusive possession on the part of one party for the purpose of establishing adverse possession. *Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434 (1993).

In the instant case, the evidence indicates that the Wanhas were the only persons to use the disputed property in any way from 1965 to 1975. At best, the Longs would have begun using the property in 1978. Prior to that time, there is no evidence that anyone other than the Wanhas used the property.

We conclude that the Wanhas' possession was continuously exclusive for a period of at least 10 years.

### (c) Notorious

The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Gustin v. Scheele*, 250 Neb. 269, 549 N.W.2d 135 (1996); *Kraft v. Mettenbrink*, 5 Neb. App. 344, 559 N.W.2d 503 (1997). If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that will generally be sufficient to establish that possession was notorious. *Dugan v. Jensen, supra.* Although the enclosure of land renders the possession of land open and notorious, and tends to show that it is exclusive, it is not the only way by which possession may be rendered open and notorious, see *Purdum v. Sherman*, 163 Neb. 889, 81 N.W.2d 331 (1957); nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient, see *Brownfield v. Bleekman*, 4 Neb. (Unoff.) 443, 94 N.W. 714 (1903). See, also, *Woodcock v. Unknown Heirs of Crosby*, 92 Neb. 723, 139 N.W. 646 (1913).

In the instant case, it is clear that the Wanhas' use was not inconspicious. See, *Pettis v. Lozier*, 217 Neb. 191, 349 N.W.2d

372 (1984); *Bailey v. Mahr*, 199 Neb. 29, 255 N.W.2d 866 (1977). There was no "clandestine occupancy and concealment" of the Wanhas' claim of title. See Henry H. Foster, *Nebraska Law of Adverse Possession*, 23 Neb. L. Rev. 1, 8 (1933). The Wanhas improved the property by constructing a sidewalk and seeding the area. The owners of Lots 106 and 107 both noted that they had never seen anyone other than the Wanhas on the disputed property prior to 1996. Robert Long himself was obviously aware of the Wanhas' possession of at least part of the disputed property, since he asked Donald Wanha for a waiver of the city setback requirements.

We conclude that the Wanhas' possession was continuously notorious for a period of at least 10 years.

### (d) Adverse Under Claim of Ownership

A possession that is adverse is under a claim of ownership. Henry H. Foster, *Nebraska Law of Adverse Possession*, 11 Neb. L. Bull. 378 (1933). Claim of ownership or claim of right means "hostile," and these terms describe the same element of adverse possession. *Berglund v. Sisler*, 210 Neb. 258, 313 N.W.2d 679 (1981). The word "hostile," when applied to the possession of an occupant of real estate holding adversely, is not to be construed as showing ill will, or that the occupant is an enemy of the person holding the legal title, but means an occupant who holds and is in possession as owner and therefore against all other claimants of the land. *Ballard v. Hansen*, 33 Neb. 861, 51 N.W. 295 (1892). The purpose of prescribing the manner in which an adverse holding will be manifested is to give notice to the real owner that his title or ownership is in danger so that he may, within the period of limitations, take action to protect his interest. It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he takes possession. *Weiss v. Meyer*, 208 Neb. 429, 303 N.W.2d 765 (1981).

Title may be acquired by adverse possession though the claim of ownership was invalid and the occupant believed he was asserting legal rights only. *Erickson v. Crosby*, 100 Neb. 372, 160 N.W. 94 (1916). The claim of adverse possession is founded upon the intent of the occupant, *such intent being determined by his acts. Nennemann v. Rebuck*, 242 Neb. 604,

496 N.W.2d 467 (1993). Intent, even though mistaken, is sufficient where the claimant occupies to the wrong line believing it to be true and even though he does not intend to claim more than that described in the deed. *Weiss v. Meyer, supra.* The possession of the occupant is not less adverse because he took and had possession innocently and through mistake; it is the visible and exclusive possession with intention to possess the land occupied under the belief that it belongs to him that constitutes its adverse character. *Vrana v. Stuart*, 169 Neb. 430, 99 N.W.2d 770 (1959).

In the instant case, the evidence clearly indicates that the Wanhas believed that the disputed property was theirs, and treated it as such, from 1965 until the present.

The Longs argue that the Wanhas' possession of the disputed property was permissive, and thus, not hostile. Permissive use of property can never ripen into title by adverse possession unless there is a change in the nature of possession brought to the attention of the owner in some plain and unequivocal manner that the person in possession is claiming adversely thereby. *McCaslin v. Meysenburg*, 228 Neb. 748, 424 N.W.2d 331 (1988). However, there is no evidence that any of the previous owners of Lot 104 gave the Wanhas any permission to use the disputed property. Thus, the Wanhas' possession was not permissive from at least 1965 until 1978, when Jolane Olander Long purchased Lot 104.

The Longs also argue that the trial court erred in relying on evidence concerning the Shannons' fence in determining that the Wanhas had adversely possessed the property. The Longs contend that there was no evidence as to whether the Shannons constructed the fence as a boundary line, and thus, that the parties did not consider it as such.

In *Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434 (1993), this court addressed a situation where neither party considered a misplaced fence the boundary. This court held that where neither party considers a fence a boundary, it does not constitute evidence of adverse possession. We concluded that the Nebraska Court of Appeals had erred in relying on evidence concerning a fence in determining that one party had adversely possessed the property.

Thus, the law is clear that the placement of a fence within one's boundary line does not lead to the relinquishment of ownership of lands outside the fence through adverse possession without an additional showing that those lands outside the fence have been used *by the neighboring landowner under a claim of ownership* for the requisite period of time. *Gustin v. Scheele*, 250 Neb. 269, 549 N.W.2d 135 (1996); *Martin v. Kozuszek*, 216 Neb. 705, 345 N.W.2d 26 (1984). Both parties need not consider the fence a boundary, see *Horky v. Schriner*, 215 Neb. 498, 340 N.W.2d 1 (1983); rather, it is the adverse possessor's intent that is relevant. In the instant case, the Wanhas clearly considered the fence to be a boundary line, which is unlike the situation in *Thornburg* where neither party considered the fence a boundary line.

We conclude that the trial court did not err in relying on evidence concerning the fence in finding that the Wanhas adversely possessed the disputed property. Moreover, we conclude that the Wanhas' possession was continuously adverse and under a claim of right for a period of at least 10 years.

### (e) Continuous

Title cannot be acquired without the simultaneous and continuous existence of each element of adverse possession for the required period. *Dugan v. Jensen*, 244 Neb. 937, 510 N.W.2d 313 (1994). The term "continuous" in the context of adverse possession means a possession for the 10-year period which is uninterrupted or stretches on without break or interruption. *Hardt v. Eskam*, 218 Neb. 81, 352 N.W.2d 583 (1984). We have already concluded in our preceding analysis that the Wanhas established the simultaneous and continuous existence of the other elements of adverse possession for a period of at least 10 years, from 1965 until 1975.

Based on our de novo review, and giving due weight to the trial court's findings, we find that the Wanhas established their adverse possession of the disputed property by a preponderance of the evidence, and we conclude that the trial court did not err in so finding.

### 3. Platted and Subdivided Land and § 14-116

The Longs argue that platted and subdivided land within a municipality cannot be adversely possessed. They also allege that the Wanhas' adverse possession altered the boundary lines of a platted lot within the city limits of Omaha and thus conflicts with § 14-116.

#### (a) Platted and Subdivided Land

The law has long been that an individual cannot adversely possess a public way. See, e.g., *Teter v. Teter*, 163 W. Va. 770, 260 S.E.2d 270 (1979). However, when streets are laid out on a plat but are not so used by the public, they are nothing more than private ways and may be adversely possessed. See, e.g., *Bauer Enterprises, Inc. v. City of Elkins*, 173 W. Va. 438, 317 S.E.2d 798 (1984); *Gammons v. Caswell*, 447 A.2d 361 (R.I. 1982); *Schlueter v. Ackerman*, 215 Md. 173, 137 A.2d 179 (1957); *Mumaw v. Roberson*, 60 So. 2d 741 (Fla. 1952); *Cook v. Langhorne*, 219 Ark. 443, 242 S.W.2d 838 (1951). This court has adopted this view. See *Schock v. Falls City*, 31 Neb. 599, 48 N.W. 468 (1891).

In *Schock*, the trial court sustained a demurrer to the plaintiff's petition. The petition had alleged that the plaintiff's land had been previously surveyed, platted, and laid out into lots, blocks, streets, and alleys. The grantors of plaintiff had enclosed and cultivated part of the platted land, including a section platted as a street, which had never been opened or prepared for public use. More than 10 years after the street had been enclosed and allegedly adversely possessed, the city of Falls City threatened to remove the plaintiff's fences and open the street to public use. This court stated, "If the allegations in the petition are true, the plaintiff has been in possession of the land in controversy adversely for a sufficient length of time to give him title by adverse possession." *Id.* at 605, 48 N.W. at 470. We held that the petition stated a cause of action entitling the plaintiff to relief.

In *Roberts v Duddles*, 47 Mich. App. 601, 209 N.W.2d 720 (1973), the appellant argued that the acknowledgment and recording of a plat creates an adverse possession estoppel between successor owners. The court rejected that argument:

"So long as the incidents of adverse possession are complied with, platted land is no less subject to adverse possession than unplatted land. To hold otherwise would defeat the historical and general application of the doctrine." *Id.* at 605, 209 N.W.2d at 722. Accordingly, we conclude that the fact Lot 104 was platted does not act to defeat the Wanhas' adverse possession claim.

### (b) § 14-116

Section 14-116 states in part:

> No owner of any real estate located in an area which is within three miles of the corporate limits of any city of the metropolitan class, when such real estate is located in any county in which a city of the metropolitan class is located, and is *outside of any organized city or village*, shall be permitted to subdivide, plat, or lay out said real estate in building lots and streets or other portions of the same intended to be dedicated for public use or for the use of the purchasers or owners of lots fronting thereon or adjacent thereto without first having obtained the approval thereof by the city council of such city and no plat of such real estate shall be recorded in the office of the register of deeds or have any force or effect unless the same shall have been first approved by the city council of such city.

(Emphasis supplied.) The Longs contend that the Wanhas' adverse possession constituted an attempt to " 'subdivide, plat, or lay out . . . real estate . . . without first having obtained the approval thereof by the City Council [of Omaha].' " Brief for appellants at 23. Accordingly, they assert that the Wanhas should have sought the city council's approval prior to bringing the instant action for adverse possession and that the Wanhas' failure to do so was fatal.

The Longs admitted that the disputed property lies within the Omaha city limits. According to its plain language, § 14-116 does not govern the subdivision of property within an organized city or village. Rather, that section governs property outside of any organized city or village. Thus, the statute does not apply to the disputed property in the instant case.

Even if the property were located within 3 miles of the city limits, § 14-116 would not apply.

> [I]t is . . . thoroughly established that the title of the adverse possessor is not derived from anything in the nature of a transfer or grant by operation of law from the former title holder. The title of the adverse possessor is independent and "relates back" to the very beginning of such possession. . . . His own possession is the *source* of his title.

(Emphasis supplied.) Henry H. Foster, *Nebraska Law of Adverse Possession*, 11 Neb. L. Bull. 378, 380 (1933). See, also, *Ziemba v. Zeller*, 165 Neb. 419, 86 N.W.2d 190 (1957) (indicating that once period of limitations has run, title is vested in adverse possessor); *Criswell v. Criswell*, 101 Neb. 349, 163 N.W. 302 (1917) (stating that adverse possession of land for period of limitation operates of itself as grant of all adverse title and interests to occupants). Thus, there is nothing left for the adverse possessor to do to gain title, i.e., no application to the city or any other authority need be made, once the period of limitations has run.

It is likewise true that an adverse possessor need not make any such application prior to the running of the period of limitations. By its own language, § 14-116 applies only to the subdivision of property by its owner. Until the period of limitations has run, the adverse possessor does not own the property that is being adversely possessed. The actual owner may bring an action to quiet his or her title at any time before the period has elapsed, rendering any application of § 14-116 a nullity.

Therefore, § 14-116 has no application to the doctrine of adverse possession and is not in conflict with it.

### V. CONCLUSION

We conclude that the Wanhas adversely possessed the disputed property and that § 14-116 does not apply to claims of adverse possession. Therefore, we affirm the district court's decision in all regards.

AFFIRMED.

MILLER-LERMAN, J., not participating.