IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WERNER RANCH V. TEAHON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

WERNER RANCH, L.L.C., APPELLEE,

V.

TRACEY TEAHON, APPELLANT.

Filed December 20, 2016.    No. A-15-1141.

Appeal from the District Court for Custer County: KARIN L. NOAKES, Judge. Affirmed.

Patrick J. Nelson, of Law Office of Patrick J. Nelson, L.L.C., for appellant.

Roger G. Steele and Liana Steele, of Steele Law Office, for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Tracey Teahon appeals from the order of the district court for Custer County which quieted title to certain disputed real property in Werner Ranch, L.L.C. Because we find that the trial court correctly found Werner Ranch established its claim for adverse possession of the disputed property, we affirm.

## II. BACKGROUND

### 1. PARTIES AND DISPUTED PROPERTY

Werner Ranch is a Nebraska Limited Liability company. Its members are Dr. Thomas Werner (Thomas) and his wife, Lynne Werner (Lynne). The Werners live in Grand Island, Nebraska, where Thomas has a medical practice as a family doctor. The Werners also have ranch property in Custer County located across the road to the north of the disputed property in this case,

- 1 -

which has been in Thomas' family since the late 1800s. The Werners are both pilots and have a small airplane that they frequently use to travel between Grand Island and the ranch property.

In 2004, the "northwest quarter of [Section 11]" (the northwest quarter) became available for purchase. Thomas testified that he wanted to purchase that quarter to build an airplane runway. He spoke to the Werners' neighbor, Frank Lynn Bartak, who was also interested in the northwest quarter. They agreed that Werner Ranch would purchase the east 120 feet of the quarter (the Werner Ranch property) to build a runway and Bartak would purchase and farm the rest of the quarter (the Bartak property). A warranty deed was filed on January 16, 2004, conveying to Werner Ranch various tracts of real property, including the Werner Ranch property, which is described as the "East 120 feet of the Northwest Quarter (NW ¼) of Section Eleven (11), Township Eighteen (18) North, Range Twenty-Four (24) West of the 6th P.M., Custer County, Nebraska."

Teahon owns the "Northeast Quarter (NE ¼) of Section Eleven (11), Township Eighteen (18) North, Range Twenty-Four (24) West of the 6th P.M., Custer County, Nebraska" (the northeast quarter). Teahon was a co-owner of the northeast quarter with her brother between December 2002 and December 2010. She became the sole owner of record of the northeast quarter in February 2011. Teahon lives across the road to the north and east of the northeast quarter in the house she lived in while growing up.

In 2004, the Werners constructed a mown-grass airplane runway along the east side of the Werner Ranch property in Section 11. The runway, which runs north and south, is approximately half a mile long and about 120 feet wide. The north end of the runway is "at Eureka Valley Road." The Werners' ranch house is on the north side of the road and is located about 150 or 200 yards northeast of the runway. The Werners usually park their plane at the north end of the runway and walk across the road to their ranch house. Thomas testified that the Werner Ranch property was desirable for use as a runway because it was close to their ranch house, and was one of the only flat areas in the surrounding hilly countryside. Its north-south orientation was also ideal because "[y]ou try to land an airplane into the wind" and most runways in Nebraska have a north-south orientation due to typical wind directions in Nebraska. The runway is located partially on the Werner Ranch property in section 11, but the eastern portion of the runway is located in the northeast quarter. What we have referred to throughout this opinion as "the disputed property," is that portion of the runway which is located in the northeast quarter.

2. COMPLAINT

On July 9, 2014, Werner Ranch filed a quiet title action in the district court against Teahon, alleging that they had acquired title to "the runway" by deed, adverse possession, and/or mutual recognition and acquiescence. Werner Ranch alleged that the eastern edge of the runway had been placed where a barbed wire fence, overgrown with brush and trees, running north and south between the parties' properties had been located and that they had maintained the runway and used it for airplane takeoffs and landings for more than 10 years. Werner Ranch alleged that Teahon had informed the Werners of her intention to destroy a portion of the runway to construct a driveway, or to use part of the runway as a driveway, and asked the court to quiet title in them.

## 3. BENCH TRIAL

A bench trial was held before the district court on September 25, 28, and 29, 2015. The court heard testimony from the Werners, Teahon, Bartak, tenants farming on both the northwest and northeast quarters, employees of the parties, and several registered land surveyors. The court received copies of surveys, photos of the disputed property, and other exhibits into evidence.

### (a) Old Fence Line

There was evidence about the dilapidated remains of a barbed wire fence overgrown with brush and trees that ran north and south between the northwest and northeast quarters. As indicated further below, the fence, brush, and trees were removed when the runway was constructed, and the eastern edge of the runway was placed where the barbed wire fence had been located.

Thomas frequently spent time on the ranch property when he was a child, and he remembered a decades-old line of fence, grass, brush and trees, which had existed between the northwest and northeast quarters since his childhood. He described the fence as an old barbed wire fence, in disrepair, with approximately half of the posts still there. He testified, "There was wire there, a lot of brush and some trees growing up through the fenceline. It was just an old fenceline." According to Thomas, the fence ran north and south along the entire distance of the quarter. He considered the fence to be the boundary between the northwest and northeast quarters and placed the east edge of the runway up against where the old fence was. Prior to construction of the runway and for as far back as Thomas could remember, there had been farm ground both to the east and to the west of the fence. A USDA aerial photograph of Section 11 taken in 2003, shows a line of separation between the farming practices of the northwest and northeast quarters, which Thomas attributed to the old fence line.

Thomas testified that at the time of the runway's construction, there were enough posts still standing in the old fence that "the line of the fence was pretty clear." During construction of the runway, most of the fence, trees, and brush were removed, as described further below, but according to Thomas, the corner posts of the old fence were left in place during and after completion of the runway. The corner posts were removed sometime in 2014, but not at Thomas' request. Photographs received into evidence show a hole where the north corner post was removed and the southeast corner post lying on the ground. Thomas indicated that before the corner posts were removed, if you "sighted down between" the north and south corner posts, the eastern edge of the runway lined up with those posts.

Lynne was familiar with the fence and when asked how long it had been there, she testified that "it appeared to me that it had been there for decades. It was a dilapidated old fence." She considered it to be the boundary between the northwest and northeast quarters. Lynne and Riley Druery, a Werner Ranch employee, testified consistent with Thomas' testimony that the east edge of the runway lined up with the northeast and southeast corner posts until they were removed in 2014.

As noted above, Bartak has owned the Bartak property since 2004. He also owns the southwest and southeast quarters of Section 11. Prior to purchasing the Bartak property in 2004, Bartak had farmed the northwest quarter continuously since the late 1970s or early 1980s. He last farmed the Bartak property in 2004, after which he rented it out to someone else to farm. Bartak

described the condition of the area between the northwest and northeast quarter as of the late 1970s or early 1980s, stating that there was a patch of weeds that ran north and south intermittently between the northwest and northeast quarters. There were also intermittent remnants of broken barbed wire running north and south in this area.

Gene McGowan has farmed the northeast quarter since approximately 1986 as a tenant of Teahon, her father, or brother. When asked about the north-south fence, McGowan remembered barbed wire in the ground, which was "terrible" if someone "would get into it with the disk," but "[n]ot really" a fence. It was, "Just a grass area we stayed away from. That was the rule, stay away from it." He stated that a varied-width strip of barbed wire, brome grass, and brush separated the quarters. He did not remember whether the strip had extended the entire length of the quarters. McGowan stated there was a large tree in the strip "right where [he] started [his] corner" that he used as his "starting point" because he did not know where "[their] corner" was.

Teahon remembered seeing remnants of a north-south fence line in the north half of Section 11 in the "general area" of the half section line when she was growing up. She testified, "There was some barbed wire on the ground, a post knocked over here or there, nothing that would keep cattle in or out." She "rode [her] ponies through there all the time" between the quarters, and she testified that fence presented "no problem for [her] to do that." Teahon denied removing a fencepost in or near the northeast corner of the runway. Teahon did remove what other witnesses referred to as the south corner post, but she testified that this had been a gate end post for an east-west fence that had extended further west when she was a child and not a corner post. According to Teahon, the "corner" had been approximately 20 feet farther west.

(b) Runway

Thomas hired Todd Harders to build a runway for the Werners. Harders brought earth moving equipment to the site and construction began in early March 2004. Thomas testified that the large construction equipment used by Harders was easily visible to anybody on the road and in the vicinity. When Harders began construction, only about half of the fence was still standing, but enough of the fence remained upright along its entire length that Harders could still plainly determine where the fence line was. He left some posts in place to use as a guide during construction, but he removed the remaining posts after completion of the runway, except for the north and south corner posts. He placed the east edge of the runway "[r]ight on the eastern fence that was there." Harders removed trees and shrubs grown in the north-south fence line. He also removed a tree, 12 to 15 inches in diameter, on the north side of the road, which might have obstructed landings or takeoffs from the runway. Harders finished his earth work to construct the runway by March 22, 2004. According to Thomas, they have tried to maintain the runway in the same location since its construction in 2004. The Werners have placed a large, bright orange windsock at the north end of the runway, right next to the road. The Werners purchased the windsock in December 2004, and did not recall exactly when they placed it at the end of the runway but assumed this had been done in December.

After the earth work was completed, the runway was seeded to a buffalo grass mix, and rye straw was spread and compacted over the seed to help in establishing the grass. McGowan was

hired by the Werners to drill grass on the runway in the spring of 2004. Bartak helped the Werners by spreading the straw for them in the spring of 2004.

Harders returned in October 2004 with heavy construction equipment to repair damage to the runway after a "big rain" that washed out some of the runway material "that needed to be smoothed back out." Harders also replaced the drainage tubes underneath the runway to accommodate more water.

Teahon testified that the mown grass area of the runway had expanded to the east over the years and had encroached further onto her land every year. McGowan described the eastern boundary of the runway as a "swooping curve" that "goes in and out" or a "slow gradual curve," rather than a straight line. He testified that the eastern edge of the runway had "slowly just crept out" to the east since 2004." Thomas disputed this testimony.

### (c) Pivots

When the Werner Ranch and Bartak properties were purchased in 2004, Werner Ranch granted Bartak an easement so that his irrigation pivot (the Bartak pivot) could cross into the runway as it made its circle. At the time the properties were purchased and the easement granted, neither Bartak nor the Werners knew the Bartak pivot crossed into the northeast quarter.

The Bartak pivot was placed on the northwest quarter in the late 1970s or early to mid-1980s. At that time, Tommy Teahon (a relative of Teahon's) owned the northwest quarter and Bartak and his father farmed the northwest quarter as Tommy's tenants. There was already a pivot on the northeast quarter at that time, and we have referred to the pivot on the northeast quarter as "the Teahon pivot." It is not clear from the record when the Teahon pivot was installed, but Teahon testified that there has been a pivot on the northeast quarter since she was a child.

Bartak testified about how he, his father, and Tommy determined the placement of the Bartak pivot. He stated that they did not use a survey when doing so. Instead, when the Teahon pivot was pointed straight west and they "saw where the end gun was, [they] looked straight down, put a flag right there, and then we measured so our pivot would just come as close as it could possibly get to their pivot and not hit it when they made circles." He testified further:

> [W]e had [the Teahon pivot] pointed straight west and then we just went up and looked at the end gun and drew a line straight down, hung a string straight down, figured that was the end of [the northwest quarter]. There was a patch of weeds 15 feet wide or so, or 20, . . . figured that has to be the line so we just measured out and put [the Bartak pivot] three or four feet from there so the end guns wouldn't hit. We used the end gun as the boundary line."

Bartak agreed that the north-south area of intermittent weeds and barbed wire separating the northeast and northwest quarters was a "get along line" and testified that when the Bartak pivot was placed by him, his father, and Tommy, they were not determining any boundary between the quarters, but were "just relying upon farming practices next door" to determine the length of the Bartak pivot.

Bartak testified that after its installation, the Bartak pivot made full circle rotations every year and that the end gun was turned on. According to Thomas, at some point in 2004, the Werners

asked Bartak to turn off the end gun to the Bartak pivot so that it would not spray water when it passed over the runway. While Bartak testified that the end gun was on for the entire 2004 "crop year," his tenant since March 2005 testified that in the period between March 2005 and trial, he had always tried to turn the end gun off during the portion of its circle that passed over the runway. Bartak's tenant testified that he had also been asked by McGowan to turn the end gun off on one occasion in 2010 or 2011 because it cast water on the farm ground in the northeast quarter. Since that time, the tenant has attempted to manage the Bartak end gun so it did not spray water onto the farm ground in the northeast quarter.

At some point in early 2004, Thomas spoke with McGowan, the tenant then farming the northeast quarter for Teahon's father, about turning off the end gun of the Teahon pivot. Thomas testified that McGowan agreed to "not run the end gun of the pivot as it passed by [the] runway" and that the Teahon pivot end gun has been "shut off over the runway" for more than 10 years. McGowan agreed that Thomas asked him to adjust the Teahon pivot so the runway would not receive water and that he did so, but McGowan thought the request had been made in 2005, the first year the runway was used as a runway. While the end gun of the Teahon pivot passes over the runway in a very short section near the center of the runway at the westernmost point of its rotation, its tires do not run on the runway. Various witnesses estimated the distance of this intrusion from the northeast quarter to be between 4 and 12 feet when the Teahon pivot is pointing directly west.

The configuration of both pivots has not changed materially since January 2004, and even with the end guns on both pivots turned off, the runway does receive some water at its midpoint. Thomas testified that, "it probably doesn't water quite the entirety of the width, but very close." There is also natural water drainage in the middle of the runway that contributes to the midpoint of the runway remaining more visibly "green" than other parts of the runway.

(d) Use and Maintenance of Runway

Thomas testified that from March 16, 2004 until the date of trial, the runway had been used continuously and exclusively as a runway. However, the Werners did not land an airplane on the runway in 2004 as it took some time before the new grass was thick enough to allow an airplane to do so. The first time Thomas landed a plane on the runway was March 1, 2005, and his flight log shows four total landings on the runway that year. For subsequent years, the flight log shows between 8 and 12 landings each year from 2006 to 2008 and in 2012; between 20 and 27 landings each year from 2009 to 2011 and in 2013; and 18 landings between January 19 and July 20, 2014.

The Werners registered the runway with the Nebraska Department of Aeronautics, which lists it as a private airfield, in 2007. This makes the runway available by use for other pilots in the event of an emergency and "puts surrounding landowners at notice . . . that there's an airfield there" that "they would have to take into consideration" if building a tower or other obstruction.

The runway has been mowed regularly by the Werners, family members, or employees since its construction, approximate "every four to five days to every week or so" during the growing season. Thomas testified that it is important to keep grass runways mowed so that airplanes can successfully take off and land. The Werners or their family or employees have also maintained the runway by filling in gopher holes, moving dirt, reseeding areas that blow open,

placing fertilizer, using a large roller to compact the soil to keep the runway smooth, and spraying for weeds.

Before March 30, 2014, Thomas had never seen a member of the Teahon family on the runway or any indication that people were using the runway for anything other than a runway. Specifically, he had not seen vehicle tracks attributed to someone other than Werner Ranch people, horse manure or tracks, or pastured cattle, and he had not seen anyone other than Werner employees or family members mowing the runway. Thomas saw no indication that people were using the runway for sledding. After the runway's construction and before March 30, no one attempted to plant crops or put up hay on the runway. While bales of hay have been stacked periodically in the southwest corner of the northeast quarter, no one has ever placed bales on the runway. Thomas testified that since the runway's construction, the cultivated crops in the northeast quarter have not intruded into the runway and there has been a narrow strip of weeds separating the runway from the "farm ground" in the northeast quarter. Both Lynne and Druery testified, consistent with Thomas' testimony, that after construction of the runway and before the dispute arose in March 2014, they saw no evidence of anyone else other than the Werners or their family or employees using the disputed property.

Bartak testified that, to his knowledge, the runway had been kept continuously as a runway from 2004 through the date of trial, and he had never seen the runway used for anything except a runway. He acknowledged that the runway could easily be farmed or used to pasture cattle.

McGowan never farmed or used the runway for any purpose except that he put gopher poison on it once at the request of Druery. When he had alfalfa on the northeast quarter, he stacked bales in the southwest corner of the quarter, but had never stacked bales on the runway.

Teahon acknowledged that the runway, with the exception of a small triangle to the north, was last used for pasturing livestock or farming sometime prior to January 1, 2004. When asked if she had ever been on the runway between January 2004 and July 2014 when this lawsuit was filed, Teahon testified that she drove up and down "that strip of land" frequently in 2013 "to look at that section where [she] wanted to build [a new] house." She testified further that many times "throughout the years," she had ridden horses out there with others, had traveled "down that strip of land to go hunting on the dam . . . that borders between [Bartak] and [herself]," and members of her family had "gone sleigh riding out there for years over the holidays."

(e) Gormley Survey

Jay Gormley completed a survey of the northeast quarter at Teahon's request on March 17, 2014. The Gormley survey was filed in the Survey Record Repository of the Nebraska State Surveyor's Office on March 24, 2014. The survey identifies the section corners, the quarter corners, and the north-south half-section line of Section 11. It also shows the mown-grass runway, an east-west fence located at the south end of the northeast quarter, and the pivot end gun arcs for the Bartak and Teahon pivots. It shows that the pivot end gun arcs meet at or near the eastern edge of the runway to the east of the identified half-section line.

During his initial visit to the northeast quarter on January 17, 2014, Gormley did a preliminary search of the entire section for all the section corners and quarter corners. Every section of land has quarter corners at approximately the mid-point between the section corners. If

the location of the quarter corners has not been previously established or if the markers for previously established quarter corners have been "lost," a county surveyor can "restore" those quarter corners, generally at equal distances between the respective section corners. During his January 2014 visit, Gormley located all of the section corners but was unable to find any of the quarter corners for Section 11. Accordingly, Gormley contacted the Custer County Surveyor's Office and asked them to locate the quarter corners. At the time of Gormley's request, the ground was frozen, so the request, which necessitated digging in the road, could not be addressed until spring when the frost was out of the ground.

In March 2014, Douglas Stevenson, the Custer County Surveyor, completed a survey and found/restored the quarter corners for Section 11. On March 12, the county road grader was used to locate the "record brick" for the north quarter corner. Stevenson was unable to find monuments for the other quarter corners, and those quarter corners were restored or reestablished at points that were equal distances between their respective section corners. The north quarter corner found by Stevenson was not located at an equal distance between the northwest and northeast section corners. Stevenson's survey shows Section 11 is narrower at its north boundary and wider at its south boundary, and that the north boundary of the northeast quarter is wider than that of the northwest quarter. Ideally, the two quarter sections would have north boundaries of equal length. The discrepancies between the distances measured by Stevenson and those shown on the "original General Land Office plat" (which did indicate that the north quarter corner was half-way between the northwest and northeast section corners) might be accounted for by differences between technology used by land surveyors in the 1800s and modern technology.

After Stevenson's survey was completed, Gormley returned to the northeast quarter to finish his survey, which he did on March 17, 2014. Gormley took additional measurements of the quarter corner distances to "double check" the information he had been given, and his measurements "agreed very closely" with Stevenson's. He then established the "center of section" by "the standard procedure of just intersecting straight lines between quarter corners." He then located encroachments close to the boundaries. Gormley testified that there were two encroachments on the northeast quarter from the northwest quarter, the pivot end gun arc from the Bartak pivot and the eastern portion of the runway. His survey shows the pivot end gun arcs for both the Bartak and Teahon pivots. The survey shows that the closest points of the pivot end gun arcs (westernmost point of the Teahon pivot and easternmost point of the Teahon pivot) fall just west of the eastern boundary of the runway.

After the complaint was filed in this case, Gormley conducted additional survey work in the north half of Section 11. In a survey dated November 19, 2014, Gormley identified the location of both the pivot tire track and the pivot end gun arc of the Bartak pivot. This survey shows that while the pivot end gun arc of the Bartak pivot encroaches on the northeast quarter, the pivot tire track does not. Both the tire track and the end gun arc of the Bartak pivot encroach on the runway. This survey does not show anything with respect to the Teahon pivot. Gormley's November survey shows a small triangular area of alfalfa, grass, and weeds near the north end of the runway. This area lies between the mown grass runway and the edge of the cultivated corn to the west. The area of alfalfa, grass and weeds does not extend east into the disputed property.

### (f) March 30, 2014, Meeting

Teahon received a copy of the Gormley survey near the end of March 2014. She did not know where the boundary between the quarters was until she received the Gormley survey. Teahon testified that March 29, when she contacted the Werners to request a meeting with them, was the first time she told the Werners that the runway encroached into the northeast quarter. Teahon and her boyfriend met with the Werners and Bartak in Grand Island on March 30. At the meeting, Teahon provided copies of the Gormley survey and informed the Werners that she intended to use part of the runway as a driveway for a house she intended to build. Prior to this meeting, the Werners had not been aware that a portion of the runway was located in the northeast quarter.

### (g) Grabowski Site Study

Paul Grabowski completed a site study of the Werner Ranch property for the Werners and provided a legal description of the disputed property. On October 24, 2014, he went to the site and located the corners that had been used in the Gormley survey. Then he "set points" along "the east edge of the runway then using common, or the usual surveying practices, [and] tied the location of those points to the quarter line which would be the line common to the northeast quarter and northwest quarter." Using the information he gathered, Grabowski wrote a legal description of "the area to the east of the quarter section line[,] that part of the runway contained in the northeast quarter." Grabowski determined that approximately 2.37 acres of the runway are located in the northeast quarter. In his site study, Grabowski noted:

> Airfield is good quality course grass, mowed less than 4 inches tall.
> Airfield is abutted by weeds more than one foot tall of cultivated crop ground.
> All bend points were established at the edge of the grass airfield clearly on the mowed surface with the lines in between crossing only on the mowed grass. The one exception is to the end of the drainage pipe where because of erosion control, mowing is not possible.

Grabowski referenced an "Existing Post Hole" at the southeast corner of the disputed property, and at trial, he testified that the mown grass of the runway "came right up to the hole."

Grabowski testified that the legal description he provided described a closed parcel of land and was prepared with enough detail that if the Werners prevailed in their claim, he could reestablish "the exact points again as property corners in a survey." He did not file his site study with the Nebraska State Survey Repository because work done solely to locate improvements is not required to be filed there. The Nebraska State Surveyor, one of the several surveyors who testified at trial, agreed that it made sense that when ownership of property was in dispute, a Nebraska surveyor would not file a survey until the judge determined who owned the property.

### 4. JUDGMENT

On November 19, 2015, the district court entered an order quieting title to the disputed property in Werner Ranch. The court found that Werner Ranch pled but did not pursue its claim of title by deed to the disputed property and dismissed that claim.

The district court found in favor the Werner Ranch on its claim of mutual recognition and acceptance of the line established by the north-south fence, brush, trees, and east edge of the

runway as the boundary between the parties' properties. The court observed that the fence, brush, tree line separated the farming practices of the northwest and northeast quarters for decades, and it stated, "It is logical to assume that the old, dilapidated fence was originally built to separate the properties." The court noted that the pivots were installed on the quarters in a manner suggesting that the fence line was used as the boundary. The court also noted testimony from farm hands and owners of both quarters that acknowledged their farming operations did not pass through the dilapidated fence line/brush area. The court found that the owners of the properties, by their conduct and silence, mutually acquiesced in establishing the dilapidated fence line/brush area as a boundary line. The court determined that the development of the runway did not change the acquiesced boundary, which was positioned against the dilapidated fence line/brush area. The court found that not only did the property owners mutually acquiesce to the dilapidated fence line/brush area as the boundary for at least 10 years prior to completion of the runway, they also acquiesced to that boundary (now the east edge of the runway) for at least 10 years since completion of the runway.

Finally, the district court also found that Werner Ranch had been in actual, continuous, exclusive, notorious and adverse possession of the disputed property under a claim of ownership for the statutory period of 10 years. The court found:

> When [Werner Ranch] began the dirt work for the runway, the possession became obvious and exclusive. The property was leveled, seeded with non-native grass, watered and mowed as residential lawns are mowed. This activity substantially shows [Werner Ranch] intended to use the property as its own. It was not cultivated or managed in the way typical farm ground would be maintained. The photographs and testimony show the possession was conspicuous and notorious for at least 10 years. Further the evidence shows that [Werner Ranch's] predecessor was in actual, continuous, exclusive, and notorious possession of the property for decades prior to 2004.

Because Werner Ranch had met its burden of proof regarding mutual acquiescence and adverse possession, the district court quieted title to the disputed property in Werner Ranch and utilized the legal description of the disputed property as set forth in the Grabowski site study in doing so.

### III. ASSIGNMENTS OF ERROR

Teahon asserts, restated and reordered, that the district court erred in (1) overruling her objections to exhibit 108, (2) finding that exhibit 108 conveyed to Werner Ranch the land described therein, (3) finding that, since grass began growing on the disputed property, the Teahon pivot did not spray or cast water onto the disputed property, (4) determining that Werner Ranch acquired the disputed property by adverse possession, (5) determining that Werner Ranch acquired the disputed property by mutual recognition and acquiescence, and (6) quieting title to the disputed property in Werner Ranch.

## IV. STANDARD OF REVIEW

A quiet title action sounds in equity. *Burnett v. Maddocks*, 294 Neb. 152, 881 N.W.2d 185 (2016). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Klein v. Oakland/Red Oak Holdings*, 294 Neb. 535, 883 N.W.2d 699 (2016).

## V. ANALYSIS

### 1. TITLE BY DEED

Teahon asserts that the district court erred in overruling her objections to exhibit 108 and finding that exhibit 108 conveyed to Werner Ranch the land described therein.

Exhibit 108 is a "WARRANTY DEED" which was "[f]iled for record" with the Custer County Register of Deeds and "entered in Numerical Index" on January 16, 2004. It states that certain real property, including "[t]he East 120 feet of the Northwest Quarter (NW¼) of Section Eleven (11), Township Eighteen (18) North, Range Twenty-four (24) West of the 6th P.M." was conveyed to Werner Ranch as grantee. Teahon's attorney objected to the offer of this exhibit at trial, stating, "Hearsay. Foundation as to notary provisions. Foundation as to what actually [is] owned if anything by the named grantors. Irrelevant without proof of what [was] owned if anything by the named grantors. Foundation as to extraneous markings that ha[ve] been placed on the document." The district court overruled the objections and received exhibit 108 into evidence.

In the background section of its opinion, the district court noted:

> [Werner Ranch] claims ownership of the East 120 feet of the Northwest Quarter (NW ¼) of Section Eleven (11), Township Eighteen (18) North, Range Twenty-Four (24) West of the 6th P.M., Custer County, Nebraska. A Warranty Deed (Exhibit 108) was filed on January 16, 2004 conveying the property to [Werner Ranch]. In the early spring of 2004, [Werner Ranch] began construction of an airplane runway located partially on this property and partially in the Northeast Quarter of this section.

In ruling on Werner Ranch's claim of title to the disputed property by deed, the district court found that Werner Ranch pled but did not pursue its claim of title by deed and dismissed that claim.

Teahon acknowledges the district court's dismissal of Werner Ranch's claim of title by deed, but she discusses the claim in her brief "because it may be argued that Werner Ranch established its deed claim as to that portion of the property in dispute which is located in the Northwest Quarter of Section 11." Brief for appellant at 18. We decline to address her arguments in this regard except to note that the court quieted title in this case to the disputed property, which we have described above as that portion of the runway which is situated in the northeast quarter of section 11. A discussion of what portion, if any, of the northwest quarter is owned by Werner Ranch is unnecessary to our determination of whether the court abused its discretion in quieting title to the disputed property in Werner Ranch. An appellate court is not obligated to engage in an

analysis that is not necessary to adjudicate the case and controversy before it. *Adair Asset Mgmt. v. Terry's Legacy*, 293 Neb. 32, 875 N.W.2d 421 (2016).

We also decline to address Teahon's argument that her objections to exhibit 108 should have been sustained beyond noting that witnesses testified that the Werners purchased the east 120 feet of the northwest quarter in January 2011. The deed is cumulative evidence of this fact. The erroneous admission of evidence is not reversible error if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012). Regardless of whether the district court erred in admitting exhibit 108, further discussion of the issue is not necessary to our resolution of the question of whether the court abused its discretion in quieting title to the disputed property in Werner Ranch. The court quieted title based on Werner Ranch's claims of adverse possession and mutual acquiescence and recognition, claims that do not rely on evidence of what property was conveyed to Werner Ranch in exhibit 108.

2. FINDING REGARDING TEAHON PIVOT

Teahon asserts that the district court erred in finding that since grass began growing on the disputed property, the Teahon pivot did not spray or cast water onto the disputed property. It is not completely clear to which finding of the court Teahon is referring. In the portion of the court's order where it noted Thomas' testimony, the court stated, "After the grass began growing, Thomas Werner talked to Gene McGowan about not running [the] end gun because it would water the runway and McGowan did so. Since the runway was built the water has never run on the runway." This statement by the court may have referred to the on/off status of the end gun of the Teahon pivot, but assuming the court meant that the runway has never received any water on its surface from the Teahon pivot, such a finding is in conflict with the evidence from the record. The evidence shows that even with the end guns on both pivots turned off, the runway does receive some water at its midpoint. Beyond noting Thomas' testimony in this regard, Teahon does not specifically argue this assignment of error, and we decline to address it further. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *State of Florida v. Countrywide Truck Ins. Agency*, 294 Neb. 400, 883 N.W.2d 69 (2016).

Teahon's brief contains an argument section regarding the presumption to be applied to the Gormley surveys as they relate to the pivots, although there is not a specific assignment of error corresponding with this argument. To the extent this argument relates to Teahon's third assignment of error regarding the spraying of water onto the disputed property, we address it briefly.

Teahon argues that the Gormley surveys are presumptive evidence of the passing of the Teahon pivot and the Bartak pivot over the disputed property. Surveys filed in accordance with the requirements of Neb. Rev. Stat. § 81-8,122.01 (Supp. 2015) "shall become an official record of survey, and shall be presumptive evidence of the facts stated therein, unless the land surveyor filing the survey shall be interested in the same." We agree that Gormley's surveys satisfy the requirements of the statute. Gormley testified that in preparing land surveys, it is customary to show encroachments without providing legal descriptions for them, which is what he did in his surveys in this case. As we set forth in the background section, exhibit 39 (Gormley's first survey)

shows the end gun arcs of both pivots intrude over the disputed property. Gormley's subsequent surveys (Exhibits 40 and 41) do not show the Teahon pivot at all, but again show that the end gun arc of the Bartak pivot intrudes onto the disputed property. There was no dispute in the evidence in this case that the end gun arcs of both pivots intruded over the disputed property. We address below the significance of this evidence as it relates to Werner Ranch's claim of adverse possession.

### 3. TITLE BY ADVERSE POSSESSION

Next, we address Teahon's assertion that the district court erred in determining that Werner Ranch acquired the disputed property by adverse possession. A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for the statutory period of 10 years. *Poullos v. Pine Crest Homes*, 293 Neb. 115, 876 N.W.2d 356 (2016). Proof of the adverse nature of the possession of land is not sufficient to quiet title in the adverse possessor; the land itself must also be described with enough particularity to enable the court to exact the extent of the land adversely possessed and to enter a judgment upon the description. *Schellhorn v. Schmieding*, 288 Neb. 647, 851 N.W.2d 67 (2014). We address each of these requirements in turn.

### (a) Actual

Actual occupancy or possession is always involved in any claim to land by adverse possession. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). No particular act is required to establish actual possession. *Id.* Rather, the acts required depend upon the character of the land and the use that can reasonably be made of it. *Id.*

While the runway, which includes the disputed property, could be cultivated for farming or used to pasture cattle as it has been in the past, it is particularly suited for use as an airplane runway because it is one of the only flat areas in the surrounding hilly countryside and due to its north-south orientation. Werner Ranch began construction on the runway in March 2004, prepared the runway for use by seeding grass, began using it for airplane landings and takeoffs in 2005, and continued to use it as an airplane runway up through when the complaint was filed in July 2014. These activities are clearly adapted to the disputed property. Both the construction and preparation activities and the use as a runway constitute actual use of the property. There is no question that Werner Ranch' use was actual for over 10 years.

### (b) Continuous

The term "continuous" in the context of adverse possession means a possession for the 10-year period which is uninterrupted or stretches on without break or interruption. *Wanha v. Long, supra*. Teahon argues that Werner Ranch's use of the disputed property was not continuous for a 10-year period because it did not use the runway for takeoff or landing until March 2005. This argument is without merit. As we noted above, Werner Ranch began using the disputed property in March 2004 when it began construction of the runway. Since construction of the runway, it has maintained and otherwise used the runway, including the disputed property without interruption

- 13 -

for more than 10 years. Werner Ranch has shown that its use was continuous for more than 10 years.

## (c) Exclusive

In a claim for adverse possession, possession must be exclusive, and if the occupier shared possession with the title owner, the occupier may not obtain title by adverse possession. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). Where the record establishes that both parties have used the property in dispute, there can be no exclusive possession on the part of one party for the purpose of establishing adverse possession. *Id.*

Teahon argues that Werner Ranch has never exclusively possessed the disputed property, first noting that every year since January 2004, both pivots have traveled over and sprayed water on the property in dispute. She notes that while the Bartak pivot has an easement to pass over the Werner Ranch property, any traveling over or spraying of water on the disputed property by the Teahon pivot cannot be attributed to any easement rights. The evidence shows that the Teahon pivot passes in the air over the disputed property at the westernmost point of its circle. The end gun overhangs the eastern edge of the runway somewhere between approximately 4 and 12 feet, although the end gun of the Teahon pivot has been turned off over the runway since 2004. The evidence does not show that the tire track of the Teahon pivot enters the disputed property at any point. Teahon does not farm any portion of the disputed property. While the record shows that the disputed property receives some water from both pivots at its midpoint, we decline to find that the movement of the end gun in the air over a portion of the disputed property and some water from the Teahon pivot spraying onto a small portion of the disputed property amounts to actual possession such that it would destroy the exclusivity of Werner Ranch's actual possession of the disputed property.

Teahon also argues that Bartak and his tenant from the west and Teahon, McGowan and others from the east used the disputed property. As with the water spray from the Teahon pivot, we decline to find that any water spray from the Bartak pivot defeats Werner Ranch's exclusive use of the disputed property. All maintenance of the runway has been performed by the Werners, their family, or their employees. Although McGowan placed gopher poison on the runway at one point, he did so at the request of a Werner Ranch employee. There is no evidence of farming or pasturing cattle on the disputed property after construction of the runway. Teahon testified that she and/or members of her family drove or otherwise traveled, rode horses and went sleigh riding on the runway in the years after its construction. Werner Ranch's witnesses denied ever seeing evidence of anyone else using the runway, which includes the disputed property, for these purposes. Although the evidence was disputed on the issue of exclusivity, the district court found that Werner Ranch's use of the disputed property was exclusive for more than 10 years. The court clearly found the testimony of Werner Ranch's witnesses on this issue to be more credible. Accordingly, we consider and give weight to the fact the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Klein v. Oakland/Red Oak Holdings*, 294 Neb. 535, 883 N.W.2d 699 (2016).

## (d) Notorious

The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in adverse possession of another. *Poullos v. Pine Crest Homes*, 293 Neb. 115, 876 N.W.2d 356 (2016).

Werner Ranch presented evidence that it cleared farm ground and an overgrown dilapidated fence line and built and maintained a mown grass runway. The eastern edge of the runway was placed along the former fence line. Once the grass planted on the runway matured sufficiently, the Werners used the runway for airplane takeoffs and landings. There was an area at the north end of the runway where they parked their airplane, and they installed a large orange windsock at the north end. The Werners mowed and maintained the runway in various ways, including the use of a large roller to compact soil. Their actions constituted visible and conspicuous evidence of possession and use of the land, and Teahon does not argue otherwise.

## (e) Adverse

A possession that is adverse is under a claim of ownership. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). Claim of ownership or claim of right means "hostile," and these terms describe the same element of adverse possession. *Id.* The word "hostile," when applied to the possession of an occupant of real estate holding adversely, is not to be construed as showing ill will, or that the occupant is an enemy of the person holding the legal title, but means an occupant who holds and is in possession as owner and therefore against all other claimants of the land. *Id.* The purpose of prescribing the manner in which an adverse holding will be manifested is to give notice to the real owner that his title or ownership is in danger so that he may, within the period of limitations, take action to protect his interest. *Id.* It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he takes possession. *Id.*

Title may be acquired by adverse possession though the claim of ownership was invalid and the occupant believed he was asserting legal rights only. *Wanha v. Long, supra.* The claim of adverse possession is founded upon the intent of the occupant, such intent being determined by his acts. *Id.* Intent, even though mistaken, is sufficient where the claimant occupies to the wrong line believing it to be true and even though he does not intend to claim more than that described in the deed. *Id.* The possession of the occupant is not less adverse because he took and had possession innocently and through mistake; it is the visible and exclusive possession with intention to possess the land occupied under the belief that it belongs to him that constitutes its adverse character. *Id.*

In this case, the Werners believed the old dilapidated fence line served as the boundary between the northwest and northeast quarters. They placed the eastern edge of the runway against this line and claimed ownership of the entire runway, including the dispute property. They maintained and used the runway as described above, and they registered the runway with the Nebraska Department of Aeronautics, which lists it as a private airfield. These acts show that Werner Ranch possessed the disputed property under a claim of right.

### (f) Particularity of Description

Teahon argues that there is no evidence in the record as to the legal description of the portion of the runway located in the northwest quarter. She argues further that Werner Ranch has not "proved any line whatsoever on the west side of the property in dispute." Brief for appellant at 24. Presumably, Teahon is relying on the somewhat unartful wording of the complaint that states Werner Ranch claims title to "the runway" by adverse possession. It is clear from the evidence at trial, however, that the property in dispute is that portion of the runway located in the northeast quarter, which is what we have referred to throughout as the disputed property. Werner Ranch provided a legal description of the disputed property at trial, and the district court utilized that legal description in awarding the disputed property to Werner Ranch. This argument is without merit.

### (g) Conclusion

Having found that Werner Ranch's possession of the disputed property was actual, continuous, exclusive, notorious, and adverse for the statutory period of 10 years, we hold that Werner Ranch acquired title to the disputed property by adverse possession. The property was described with enough particularity to enable the district court to determine the extent of the land adversely possessed and to enter a judgment upon the description. The district court did not err in quieting title to the disputed property in Werner Ranch on this basis.

### 4. TITLE BY MUTUAL RECOGNITION AND ACQUIESCENCE

Teahon asserts that the district court erred in determining that Werner Ranch acquired the disputed property by mutual recognition and acquiescence.

Because we have already found that the district court properly quieted title to the disputed property in Werner Ranch based on its claim of adverse possession, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Adair Asset Mgmt. v. Terry's Legacy*, 293 Neb. 32, 875 N.W.2d 421 (2016).

### VI. CONCLUSION

Werner Ranch's possession of the disputed property was actual, continuous, exclusive, notorious, and adverse for the statutory period of 10 years. The property so possessed was described with sufficient particularity to enter a judgment upon the description. Accordingly, we affirm the district court's decision quieting title to the disputed property in Werner Ranch.

AFFIRMED.