IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


OLMSTEAD V. O'CONNOR


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


BLAKE A. OLMSTEAD AND EMBER J. OLMSTEAD, HUSBAND AND WIFE, APPELLEES,

V.

TIM O'CONNOR AND JANAE O'CONNOR, HUSBAND AND WIFE, ET AL., APPELLANTS.


Filed October 30, 2018.    No. A-17-1132.


Appeal from the District Court for Keith County: DONALD E. ROWLANDS, Judge. Affirmed.

Philip E. Pierce, of Pierce Law Firm, for appellants.

Glenn A. Pelster, of Pelster Law Firm, for appellees.


MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Tim O'Connor and Janae O'Connor (the O'Connors) appeal from an order of the district court of Keith County which quieted title to 0.10 acres of land owned by the O'Connors to Blake A. Olmstead and Ember J. Olmstead (the Olmsteads) under the theory of adverse possession. For the reasons set out below, we affirm.

## II. BACKGROUND

In 2013, the Olmsteads purchased Lot 105, Lakeshore Subdivision, Keith County, Nebraska (Lot 105), from Delores Koeppen. Lot 105 contained a house which faced Lake McConaughy, and was purchased to be used as a vacation home for the Olmsteads. Directly to the east of Lot 105 lies Lot 224, which was owned by William Hadl, but remained vacant until 2016.

In 1986, Koeppen purchased Lot 105 and her family used it weekly as a vacation home. In the early 1990's, Koeppen's brother-in-law planted 13 cedar trees and shrubbery in a straight line

- 1 -

on what Koeppen believed to be the eastern border of Lot 105. However, the trees and shrubbery actually encroached 26.10 feet onto Lot 224. Koeppen mistakenly believed that Lot 105 extended to a green post which lay to the northeast of existing trees on her land, and the trees planted by Koeppen were inside the post. Throughout her ownership of Lot 105, Koeppen mowed and maintained her property up to the post in accordance with local rules regarding property maintenance. Koeppen additionally cleaned tumbleweeds and leaves out of the trees and shrubbery on her property.

When the Olmsteads purchased Lot 105 from Koeppen they did not have a survey conducted to determine the extent of their new property. The Olmsteads relied on their real estate agent who indicated that Lot 105 extended east to the green post, including the cedar trees planted by Koeppen, and that the property line ran south along the tree line to the southern border of Lot 105. Lot 105 was mowed and maintained to the green post, where Lot 105 abutted Lot 224, which was vacant at the time.

In 2016, the O'Connors purchased Lot 224. The O'Connors planned to construct a house in the range of $200,000-$600,000 on the land, which they would then sell. After purchasing Lot 224, the O'Connors had a survey conducted, which indicated that the cedar trees planted by Koeppen were actually on Lot 224. The O'Connors also walked around Lot 224 after purchasing it, and observed stakes in the northwest corner which were placed during a replat of property to the north of Lot 224 in 2011.

Following this survey, the Olmsteads discovered the survey stakes around their property, which marked the property line between Lots 105 and 224. After finding the stakes, the Olmsteads contacted their attorney, fearing that their trees would be removed due to the stakes indicating that the trees were actually on Lot 224, not Lot 105. The Olmsteads' attorney sent a letter to the O'Connors stating that the Olmsteads contested the location of the property line between Lots 105 and 224, and requested that the O'Connors not remove the trees until the matter was resolved. The O'Connors, however, removed the trees prior to the property dispute being resolved.

The Olmsteads subsequently brought an action to quiet title to 0.10 acres of Lot 224 (disputed property), alleging that they had acquired "the West fifty (50) feet of lot 224" by adverse possession. Additionally, the Olmsteads sued the O'Connors for trespass for removing their trees. The O'Connors filed a counterclaim for damages against the Olmsteads for placing a cloud on the title to the O'Connors' property.

Following a bench trial, the district court granted the Olmsteads' claim of adverse possession of the disputed property, legally described as:

[b]eginning at the NW of Tract 224, Lakeshore Subdivision, Keith County, Nebraska; thence easterly on the north line of said tract, 37.29 feet more or less to the corner common to Lots 4 & 5, Bennet's Replat; thence southerly 138.82 feet more or less to a point on the south line of said Tract 224; thence westerly on said south line, 26.10 feet more or less to the SW corner of said tract; thence northerly on the west line of said tract, 138.47 feet more or less to the Point of Beginning, containing 0.10 acres, more or less.

The district court dismissed the Olmsteads' complaint of trespass against the O'Connors, and dismissed the O'Connors' counterclaim against the Olmsteads. The O'Connors subsequently appealed the district court's decision quieting title to the disputed property in Olmsteads.

## III. ASSIGNMENTS OF ERROR

The O'Connors assign, restated, that the district court erred (1) in granting the disputed property to the Olmsteads because the boundary of the claimed property was based upon speculation and conjecture, and (2) in finding that the Olmsteads had actually and notoriously occupied and controlled the disputed property for a continuous 10-year period.

## IV. STANDARD OF REVIEW

A quiet title action sounds in equity. On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination. *Poullos v. Pine Crest Homes*, 293 Neb. 115, 876 N.W.2d 356 (2016). Where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Inserra v. Violi*, 267 Neb. 991, 679 N.W.2d 230 (2004).

## V. ANALYSIS

### 1. SUFFICIENT DESCRIPTION OF DISPUTED PROPERTY

In their first assignment of error, the O'Connors argue that the description of the disputed property was insufficient to grant the Olmsteads adverse possession because it was based on speculation and conjecture. We disagree.

Nebraska courts have placed a high burden on the party claiming title by adverse possession to provide a description of the land to which he or she is claiming. *Sawtell v. Bel Fury Investments Group*, 19 Neb. App. 574, 810 N.W.2d 320 (2012). Proof of the adverse nature of the possession of the land is not sufficient to quiet title in the adverse possessor; the land itself must also be described with enough particularity to enable the court to exact the extent of the land adversely possessed and to enter a judgment upon the description. *Inserra v. Violi, supra*. Thus,

> a claimant of title by adverse possession must further show the extent of his possession, the exact property which was the subject of the claim of ownership, that his entry covered the land up to the line of his claim, and that he occupied adversely a definite area sufficiently described to found a verdict upon the description.

*Inserra v. Violi*, 267 Neb. at 994-95, 679 N.W.2d at 234. The Nebraska Supreme Court has explained that the land must be sufficiently described to found a verdict upon the description. *Steinfeldt v. Klusmire*, 218 Neb. 736, 359 N.W.2d 81 (1984). The description must also be exact and definite. *Petsch v. Widger*, 214 Neb. 390, 335 N.W.2d 254 (1983). This burden is not met where the metes and bounds of the area claimed would rest on speculation and conjecture. *Inserra v. Violi, supra*.

The Supreme Court has rejected adverse possession claims when the burden to provide a specific description is not met. See, e.g., *Inserra v. Violi*, 267 Neb. at 996, 679 N.W.2d at 235 (land description provided "at best an approximate location of the claimed boundary"); *Matzke v. Hackbart*, 224 Neb. 535, 541, 399 N.W.2d 786, 791 (1987) (description provided was "an admitted estimation, with no factual basis expressed in the record"); *Steinfeldt v. Klusmire*, 218 Neb. at 739, 359 N.W.2d at 83 (noting that claimant's "evidence failed to establish any specific boundaries").

Here, the O'Connors argue that the disputed property was not sufficiently described because both the northeast and southeast borders were based on speculation and conjecture, and the legal description provided by the surveyor was based on a metes and bounds description provided by the Olmsteads' attorney. Each of the O'Connors' arguments are meritless.

The disputed property claimed by the Olmsteads was sufficiently described. The legal description for the disputed property is:

> [b]eginning at the NW of Tract 224, Lakeshore Subdivision, Keith County, Nebraska; thence easterly on the north line of said tract, 37.29 feet more or less to the corner common to Lots 4 & 5, Bennet's Replat; thence southerly 138.82 feet more or less to a point on the south line of said Tract 224; thence westerly on said south line, 26.10 feet more or less to the SW corner of said tract; thence northerly on the west line of said tract, 138.47 feet more or less to the Point of Beginning, containing 0.10 acres, more or less.

This description is definite and exact, and provides sufficient ground for the district court's verdict.

The northeast corner of the disputed property lies 37.29 feet east of the property line between Lots 105 and 224. Koeppen testified that she believed the northeast corner of her property was a green stake located north of a line of existing trees, and to the east of the tree line she planted. Blake Olmstead testified that, although he did not have a survey conducted when he bought the property, his realtor indicated that a green stake to the east of the tree line was the border of Lot 105, and that the property line ran directly south from the post along the tree line. Thus, the northeast boundary was not based on speculation and conjecture. Both Koeppen and Blake Olmstead indicated that there was a clear marker where they believed Lot 105 ended.

Further, Koeppen mowed and maintained Lot 105 up to the green post, making a clear border between Lot 105 and Lot 224, and occupying the full extent of the disputed property. While the O'Connors did present testimony that a green post was not placed on the northeast corner of the tree line until 2011, Koeppen's testimony contradicts this claim. Moreover, Koeppen's testimony that she mowed and maintained her yard to the post east of the tree line indicates that she occupied the full extent of the land claimed by the Olmsteads. Our de novo review of the record demonstrates that the northeast boundary of the disputed property was exact and definite, and not based on speculation or conjecture.

Likewise, the record indicates that the southern border of the disputed property was not based on speculation or conjecture. The eastern edge of the disputed property runs southward from the northeast border along the tree line, ending 26.10 feet east of original property line between Lots 105 and 224. This tracks the extent that the trees encroach on Lot 224, which is 26.10 feet. The O'Connors' argument that neither Koeppen nor the Olmsteads could adequately describe the southern border of the disputed property is meritless.

Blake Olmstead testified that the property line of Lot 105 was clear, running from the green post in the northeast to the road at the southern edge of his property. The southern border of Lot 105 and 224 was established by a survey, thus is exact and definite. Further, Koeppen testified that she mowed and maintained her property up to this line, which included the trees she had planted, showing the exact property which the Olmsteads claimed under adverse possession. Therefore, the southern border of the disputed property was not based on speculation and conjecture, but rather, was described with enough particularity to enable us to determine the extent of the land adversely possessed by the Olmsteads. We find that the southern boundary of the disputed property was adequately described.

Although the legal description of the disputed property provided in exhibit 2 was based on a metes and bounds description provided to the surveyor by the Olmsteads' attorney, the description of the property is exact and definite. Moreover, the O'Connors' reliance on the Supreme Court's decisions in *Inserra v. Violi, supra*; *Matzke v. Hackbart, supra*; and *Steinfeldt v. Klusmire, supra*, is misplaced. In each of those decisions, the Supreme Court found that the district court improperly awarded adverse possession of disputed land because the record was insufficient to properly identify the full extent of the disputed property. In *Inserra v. Violi*, the disputed property ran "pole to pole" along the property line. 267 Neb. at 995, 679 N.W.2d at 234. Likewise, in *Steinfeldt v. Klusmire*, the Supreme Court found that there was insufficient evidence to establish specific boundaries for the claimed property. 218 Neb. at 739, 359 N.W.2d at 83. Here, however, the legal description of the disputed property sufficiently described the full extent of the property claimed by the Olmsteads. Although the O'Connors contest that the boundaries of the property were based on speculation and conjecture, the record indicates that the disputed property was sufficiently described, and was exact and definite.

The legal description of the disputed property was sufficient for the district court to grant the Olmsteads' claim of adverse possession. Further, the Olmsteads demonstrated that they possessed the entirety of the disputed property. We find that the description of the disputed property was sufficient to grant the Olmsteads' claim of adverse possession over the property.

## 2. ADVERSE POSSESSION

In their second assigned error, the O'Connors argue that the district court erred in finding that the Olmsteads adversely possessed the disputed property because there was no evidence that the Olmsteads actually and notoriously occupied the property for a continuous 10 year period. We disagree.

A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for the statutory period of 10 years. *Poullos v. Pine Crest Homes, supra*. Here, the district court found the Olmsteads' possession of the disputed property to be continuous, exclusive, and under a claim of ownership for a period of at least 10 years. Upon our de novo review of the record, we conclude that the district court was correct in finding that Olmsteads' possession of the property was continuous, exclusive, and under a claim of ownership for a period of at least 10 years. The O'Connors argue that the Olmsteads' possession was not actual and was not notorious. We therefore address those two factors.

### (a) Actual Possession

The Olmsteads, through Koeppen, actually possessed the disputed property for a continuous 10 year period. Actual occupancy or possession is always involved in any claim to land by adverse possession. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). No particular act is required to establish actual possession. *Id*. Rather, the acts required depend upon the character of the land and the use that can reasonably be made of it. *Id*.

Here, Koeppen treated the disputed property as her own land, planting trees and shrubbery on the property. Koeppen mowed and maintained her entire property, including the trees and yard of the disputed property. After approximately 1989, she never saw anyone on Lot 224, and neither it, nor the disputed property, was maintained or mowed by anyone other than Koeppen or those she hired. When the Olmsteads purchased Lot 105 from Koeppen in 2013, Koeppen had been in continuous, actual possession of the disputed property for more than 10 years. The district court was correct in finding that the Olmsteads had actual possession of the disputed property for 10 continuous years.

### (b) Notorious Possession

The Olmsteads' possession of the disputed property was notorious. The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in adverse possession of another. *Poullos v. Pine Crest Homes, supra*. If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that will generally be sufficient to establish that possession was notorious. *Id*. Although the enclosure of land renders the possession of land open and notorious, it is not the only way by which possession may be rendered open and notorious. Rather, nonenclosing improvements to land, such as erecting buildings or planting groves or tress, which show an intention to appropriate the land to some useful purpose, are sufficient. *Id*.

The Supreme Court has found adverse possession where the use of the land similarly included something more than general acts of maintenance. See, *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003) (possession was notorious where adverse holders planted grass, mowed and maintained property, erected snow fence in winter, and left fenceposts permanently in place); *Purdum v. Sherman*, 163 Neb. 889, 81 N.W.2d 331 (1957) (possession was notorious when adverse holder's cattle grazed disputed land). Acts of routine yard maintenance, however, without more, are not sufficiently notorious to warn the titleholder that another is claiming or using the land for his own purpose. *Poullos v. Pine Crest Homes, supra*.

Here, Koeppen testified to planting trees and shrubbery on Lot 224 in the early 1990's. The trees were visible and conspicuous on Lot 224. Additionally, Koeppen would mow east of the tree line, clean tumbleweeds and leaves out of the tree line, and maintain her property in accordance with local rules requiring property owners to keep their lots clean whereas the remainder of Lot 224 remained unkept. These acts were visible and conspicuous uses of the disputed property, and were sufficient to put an ordinarily prudent person on notice that Koeppen was encroaching on their land.

Moreover, Blake Olmstead testified that the extent of Lot 105 was clear because of the tree line and the point to which the yard was maintained. Although routine yard maintenance alone is not enough for a claim of adverse possession, here, the routine maintenance done by Koeppen was in conjunction with planting trees and shrubbery, and was done in accordance with local rules regarding maintenance of lots. Together, these acts were sufficiently notorious to put the owner of Lot 224 on notice that Koeppen was encroaching on their land. The O'Connors' argument that "the described claimed property was clandestine to the owners of Lot 224" is without merit. Brief for appellant at 15. Koeppen planted trees and shrubs on the disputed property, as well as mowed and maintained the entirety of claimed property, thus, the owner of Lot 224 was warned that another was encroaching on his land for their own use.

The district court was correct in determining that the Olmsteads, through Koeppen, had notoriously possessed the disputed property. Therefore, the district court was correct in quieting title to the disputed property in the Olmsteads under the theory of adverse possession.

## VI. CONCLUSION

The district court was correct in quieting title to the disputed property in the Olmsteads because the property was sufficiently described in exhibit 2, and the Olmsteads satisfied all necessary elements in their adverse possession claim.

AFFIRMED.