Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/27/2026 08:08 AM CDT

James Goldie and Carol Goldie, husband and wife,
and the Carol J. Goldie and James Goldie Living
Trust, appellees, v. McNeil & Company Builders,
LLC, and McNeil Company, Inc., a Nebraska
corporation, appellants.

___ N.W.3d ___

Filed March 27, 2026.    No. S-24-944.

1. **Equity: Quiet Title.** A quiet title action sounds in equity.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.
3. **Equity: Evidence: Appeal and Error.** In an appeal of an equity action, where credible evidence is in conflict on a material question of fact, an appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and their manner of testifying and accepted one version of the facts rather than another.
4. **Adverse Possession: Proof: Time.** A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years.
5. **Adverse Possession: Notice.** To be effective against the true owner, acts of dominion over land allegedly adversely possessed must be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another.
6. **Adverse Possession.** If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, such will generally be sufficient to establish that possession was notorious.
7. **____.** Although the enclosure of land renders the possession of land open and notorious, and tends to show that it is exclusive, it is not the

only way by which possession may be rendered open and notorious. Nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient.

8. **Adverse Possession: Words and Phrases.** A possession that is adverse is under a claim of ownership. Claim of ownership or claim of right means "hostile," and these terms describe the same element of adverse possession. The word "hostile," when applied to the possession of an occupant of real estate holding adversely, is not to be construed as showing ill will, or that the occupant is an enemy of the person holding the legal title, but means an occupant who holds and is in possession as owner and therefore against all other claimants of the land.

9. **Adverse Possession: Notice.** The purpose of prescribing the manner in which an adverse holding will be manifested is to give notice to the real owner that his or her title or ownership is in danger so that the real owner may, within the period of limitations, take action to protect his or her interest. It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he or she takes possession.

10. **Adverse Possession: Title.** Permissive use of property can never ripen into title by adverse possession unless there is a change in the nature of possession brought to the attention of the owner in some plain and unequivocal manner that the person in possession is claiming adversely thereby.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Affirmed.

David L. Welch and Maggie L. Brokaw, of Pansing Hogan Ernst & Buser, L.L.P., for appellants.

Jay A. Ferguson for appellees.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Funke, C.J.
## INTRODUCTION
McNeil & Company Builders, LLC, and McNeil Company, Inc. (collectively the McNeil Companies), appeal the order of the district court for Douglas County that quieted title

to certain property in the Carol J. Goldie and James Goldie Living Trust (the Trust). The order quieting title had been requested in a complaint filed by James Goldie and Carol Goldie and the Trust (collectively the Goldies) in which they set forth a claim to the property based on adverse possession. The McNeil Companies challenge the district court's finding of adverse possession by the Goldies, and they specifically challenge the findings that the possession was notorious and that it was adverse under a claim of ownership. The McNeil Companies argue, in part, that the possession was not adverse because the Goldies' use of the property was permissive.

The Goldies dispute that permission was given for their use of the property, and they argue that even if permission had been given as the McNeil Companies alleged, such permission was given after the adverse possession had begun. The Goldies contend that under Nebraska law, permission must be given prior to the commencement of adverse possession to be effective against a claim of adverse possession. We affirm the district court's order.

## BACKGROUND

The Goldies own real property in Omaha, Nebraska, legally described as "Lot 30, Rose Garden Estates" (the Goldie Property). The McNeil Companies own land adjacent to the Goldie Property, legally described as "Lot 262, Rose Garden Estates and Lot 2, [R]ose Garden Estates Replat 1, an Administrative Replat of Lot 263, Rose Garden Estates" (the McNeil Property). At dispute in this case is a portion of the McNeil Property that abuts the southern border of the Goldie Property (the Disputed Property).

### OPERATIVE AMENDED COMPLAINT
### AND ANSWER

The Goldies filed this action in 2022, seeking to quiet title to the Disputed Property in their name. In the operative amended complaint filed March 15, 2023, the Goldies set

forth a claim of adverse possession and requested as relief that title to the Disputed Property be quieted in the Trust.

The Goldies alleged that James and Carol purchased the Goldie Property in 1988 and transferred ownership of the Goldie Property to the Trust in 2018. The Goldies alleged that McNeil & Company Builders purchased the McNeil Property from Westport Apartments, L.L.C., in 2004. In the complaint, the Goldies described the Disputed Property as an area south of the Goldie Property that extended 40 feet into the McNeil Property on the southwest side and 50 feet into the McNeil Property on the southeast side, with the two sides connected by a line approximately 65 feet in length.

The Goldies alleged that they started using the Disputed Property when they purchased their property in 1988 and that in 1989, they put up a fence at the south end of an area that extended 20 feet into the McNeil Property. They further alleged that in 1989, they started intentionally using the Disputed Property—which extended beyond the fence into the McNeil Property—as their own property for recreational purposes and maintained the land by mowing, fertilizing, weeding, and caring for trees. They alleged that for a period of 10 or more years thereafter, they had actual, continuous, exclusive, notorious, and adverse possession of the Disputed Property, and that both the McNeil Companies and their predecessors in title failed to timely object to the Goldies' use of the land. The Goldies set forth various additional actions that they alleged they had taken at their expense in the years following 1989 with respect to the Disputed Property.

The Goldies alleged that after the McNeil Companies purchased the McNeil Property from Westport Apartments in 2004, the Goldies' possession and use of the Disputed Property would have been obvious to the casual observer. They alleged that if a survey had been obtained by the McNeil Companies, it would have shown that the Goldies' use and possession of the land extended into the McNeil Property and was adverse to the McNeil Companies' ownership. The Goldies further

alleged that in 2022, the McNeil Companies announced plans to develop the McNeil Property, placed "No Trespassing" signs on the Disputed Property, and sent correspondence demanding that James and Carol remove their property from the Disputed Property.

The McNeil Companies filed an answer to the Goldies' amended complaint in which they alleged that the McNeil Companies' ownership and possession of the McNeil Property began "in 1997 and started with Westport Apartments." Testimony at trial indicated that the McNeil Companies and Westport Apartments had common owners and officers. The McNeil Companies set forth various affirmative defenses, including an allegation that in 1997, when the McNeil Property was owned by Westport Apartments, Patrick McNeil (Patrick), chief executive officer of the McNeil Companies and an owner of Westport Apartments, sent letters by certified mail to adjacent property owners, including James. The letters stated that previous owners of the McNeil Property had granted permission to adjacent property owners for limited use of portions of the McNeil Property and that while Westport Apartments planned to develop the McNeil Property and would discontinue permissive use at that time, Westport Apartments would allow limited permissive use to continue until then. The letters requested adjacent property owners to sign an acknowledgment and consent form and stated that if a property owner did not sign the acknowledgment and consent form by a certain date, Westport Apartments would take actions to prevent future use or occupancy of the McNeil Property.

## The Goldies' Evidence at Trial

At trial, the Goldies presented evidence and testimony, including testimony by both James and Carol. Carol testified extensively regarding the Goldies' use of the Disputed Property since they purchased the Goldie Property in 1988. She testified as follows. When the Goldies first purchased the Goldie Property, Carol observed the area south of their

lot to be "not cared for, . . . neglected and abandoned." After moving onto their property, the Goldies "proceeded to clear [the Disputed Property] by treating the weeds; picking up the limbs that had been laying in the area; cutting them and adding them to the woodpile . . . and just continuing to work to clean up the area so that [they] could plant grass seed." At the time the Goldies began clearing the Disputed Property in June 1988, they did not know who owned the land and did not have permission from anyone to clear the area.

Having "put in a lot of hours and some money" to clear the area, the Goldies decided they "should take over that property, should own it," so they "put up a post and rail fence 20 feet south of [their] lot line." Their purpose in putting up the fence was "to keep [their] dog in and to keep others out" because they had "planted grass and . . . wanted other people to know that that was [their] property and to stay out." At the time, the Goldies knew where the lot line of the Goldie Property was, and they had seen "No Trespassing" signs on the McNeil Property. The Goldies did not do anything to obscure or hide the fence, which they had put up in 1989. They were aware that the fence was beyond their lot line and that they did not have permission from anyone to put up the fence or otherwise maintain the area.

After clearing the area south of their lot line, the Goldies used the area for "family activities," such as playing horseshoes and badminton and having barbecues and picnics. While they had cleared some trees from the area, they kept certain trees, including a large maple tree in which they built a treehouse in 1989. The boundaries of the land in the Disputed Property that the Goldies had cleared "were formed by where [James] would mow." James regularly mowed the Disputed Property, and the mowing left visible ruts.

In addition to putting up a fence and building a treehouse, the Goldies added landscaping to the Disputed Property that was like landscaping they had done on the Goldie Property. They planted a linden tree in the Disputed Property in 1998,

and it remained there until they had it removed after it was struck by lightning in 2021. Carol began a garden on the Disputed Property in 2009.

The Goldies removed the fence in 2004, because some of the posts were decayed, they no longer had the dog, and removing the fence "made it easier [to access] the rest of" the Disputed Property. Carol gave examples of other work they performed on the Disputed Property, including cleaning up large tree limbs and branches that had fallen after a severe ice storm in 1997, having a large pile of wood removed, removing the maple tree in 2005, having a diseased ash tree that they had planted on the Disputed Property removed in 2019, having the linden tree treated for Japanese beetle infestations in 2019 and 2020, and having a sprinkler system installed on their property in 2016 that ran underground into the McNeil Property to the garden they had planted in the Disputed Property. During Carol's testimony, the court received into evidence various photographs that Carol purported to depict the condition of the Disputed Property and the Goldies' use of the Disputed Property on various dates since the Goldies began using the area until more recent years.

Carol learned at a homeowners' association meeting in 2022 that the McNeil Companies planned to develop the McNeil Property. She became upset after learning that the development plans included the Disputed Property, and she responded by taking photographs of the Disputed Property to show that the Goldies had maintained it in the same way they maintained their own backyard. In December 2022, the Goldies received a certified letter from the McNeil Companies giving them notice to remove personal belongings, structures, or other items from the McNeil Property.

Regarding the McNeil Companies' defense that the Goldies were given permission in a letter in 1997 to use the Disputed Property, Carol testified that James had not ever told her that he received such a letter. She also testified that no such letter had been sent to her and that the McNeil Companies

asserted only that letters had been sent to James. She testified that since 1997 and until the notice in 2022, the McNeil Companies had not done anything to dispossess the Goldies of the Disputed Property.

James testified at the trial as follows. When the Goldies purchased their property in 1988, the area south of the Goldie Property was "[u]nkept, abandoned," with "a lot of debris that needed to be cleaned out." The Goldies put up a fence on the Disputed Property in 1989, and they put gates in the fence so that they could access the rest of the Disputed Property. After the Goldies removed the fence in 2004, they continued to use the entirety of the Disputed Property. The Goldies had improved the Disputed Property by adding trees, landscaping, gardens, and bushes, and they had mowed and fertilized the Disputed Property just as they had done in their own backyard. Regarding the McNeil Companies' defense that the Goldies had been given permission by letter in 1997 to use the Disputed Property, James testified that he had not received such a letter and that the first time he had learned that a letter had allegedly been sent to him was during this litigation.

### The McNeil Companies' Evidence at Trial

Evidence presented by the McNeil Companies focused on their affirmative defense that the Goldies had been given permission from Westport Apartments in 1997 to use the Disputed Property. Patrick testified that he was the chief executive officer of the McNeil Companies and an owner of Westport Apartments. Prior to Westport Apartments' purchase of the McNeil Property in 1996, Patrick walked around the property and did not see anything, such as permanent structures or footings, that would indicate that anyone was claiming ownership of any portion of the property. After Westport Apartments purchased the McNeil Property, Patrick sent letters to adjoining property owners "just to let everybody

know that they had the right to use the property . . . until
[Westport Apartments] decided to start the multi-family proj-
ect." Patrick testified that to his knowledge, a letter had been
sent to the Goldies.

A copy of the letter that Patrick alleged was sent to James
was admitted into evidence. The letter was dated May 23,
1997, and was prepared for Patrick's signature. The letter
stated, in part, that "[o]ne or more of the owners of property
adjacent to [the McNeil Property] were granted permission
by the previous owners . . . to plant gardens, landscape or
otherwise use parts of" the McNeil Property. The letter further
stated that plans for development of the McNeil Property had
not been finalized but that it was "anticipate[d] that some
development of this property will occur in the future." The
letter stated that Westport Apartments would not "discontinue
the past practice of allowing adjacent property owners to con-
tinue some limited use of" the McNeil Property, but with the
"understanding that at some point in the relatively near future,
[the McNeil Property] will be developed and, absent from
further agreement, all such uses will have to be discontinued."
The letter requested recipients "to sign the Acknowledgment
and Consent which is affixed to this letter and to provide
proof of liability insurance if they desire to continue to use
any part of [the McNeil Property] for any purpose." The
letter further stated if a recipient chose "not to execute the
Acknowledgment and Consent, Westport Apartments . . . will,
as of June 15, 1997[,] take actions to prevent any further use
or occupancy of" the McNeil Property.

A second letter that was addressed to James, dated August
25, 1997, and signed by Patrick, was also admitted into
evidence. The second letter referred to the May 1997 letter
and noted that James had been asked for "written Consent
and Acknowledgment to the matters specified in the letter."
The letter stated that Westport Apartments had not received
a response to the May letter and that if James chose "not
to provide the requested Consent and Acknowledgment by

September 30, 1997, Westport Apartments . . . will proceed with appropriate action to remove any encroachments, which may include initiation of legal proceedings."

Patrick testified that despite the language in the second letter, there was no intent to file a lawsuit against any property owner who did not return the consent form because Westport Apartments had no notice that there was any "permanent structure or anything" or that anyone "was using the property different than what we had hoped they would use it for." Patrick testified that between 1996 and 2022, he had walked around the McNeil Property approximately 50 times and had never seen any permanent structures or footings placed on any part of the property or any activities by adjacent property owners that indicated a claim of ownership to any portion of the property. Patrick testified that Westport Apartments deeded the McNeil Property to McNeil & Company Builders in 2004 and that in approximately 2021, the McNeil Companies decided it was time to start developing the property.

On cross-examination, Patrick testified that despite the statement in the May 1997 letter that previous owners of the McNeil Property had granted certain permissions to adjacent property owners, he had no personal knowledge that permission had been given for adjacent property owners to use the property to plant gardens, landscape, or perform other activities. He also testified on cross-examination that he had not filed any lawsuit to remove anyone from the McNeil Property or any portion of it.

Joyce Snowden testified that she was retired but that for the previous 30 years, she was vice president of finance for the McNeil Companies. Her duties included accounting, finance, and overseeing administration of the McNeil Companies. She was responsible for mailings, including the mailings that were sent in 1997 to property owners who lived adjacent to the McNeil Property. Snowden testified that in 1997, she had created a spreadsheet regarding the mailings, and the court received a copy of the spreadsheet into

evidence. Snowden had filled out most of the spreadsheet and had supervised assistants who completed other parts. The spreadsheet listed adjacent property owners to whom letters had been sent in May and August 1997 and had columns to indicate whether each letter had been sent, whether a return receipt card had been returned, and whether a consent form had been returned. The spreadsheet included a line for "James Goldie," indicating the street address of the Goldie Property. The line for James indicated a "Y" for the May 1997 letter's being sent and for a return receipt card's being received, as well as for the August 1997 letter's being sent. The line included a dash in the column for the consent form's being returned in response to the May letter, and it included an "N" in the column for a return receipt card's being received for the August letter. Snowden testified the spreadsheet indicated that the May letter had been sent to "the Goldie residence" and that a return receipt card had been received.

On cross-examination, Snowden testified that while the spreadsheet led her to "believe" she received a return receipt card for the May 1997 letter, she did "not recall if it was signed or unsigned." She also testified that she did not have the actual return receipt card from the May 1997 mailing, that the August 1997 letter to James was returned to her and marked as "unclaimed," and that the return receipt card for the August letter was unsigned.

## District Court's Order

After trial, the district court entered an order in which it found in favor of the Goldies on their claim of adverse possession and quieted title to the Disputed Property in the Trust. Citing the relevant legal standard, the court found that the Goldies had shown by a preponderance of the evidence that they had been in actual, continuous, exclusive, notorious, and adverse possession of the Disputed Property under a claim of ownership for at least 10 years.

Regarding actual, continuous, and exclusive possession, the court found that when the Goldies purchased their property in 1988, they "began 'expanding' their back yard to encroach on" the McNeil Property, "including erecting a split rail fence," "planting a tree," and "removing downed trees." The court further found that the Goldies "mowed, fertilized and weeded, and cared for the disputed property beginning in 1989" and that they "planted a garden on the disputed property." The court found that "from 1988 until 1998, no one other than the Goldies used or maintained the disputed property," and that "[t]heir use and maintenance was conspicuous." Based on these findings, the court found that "the Goldies actually and continuously possessed the disputed property for a period of at least 10 years" and that, regarding exclusive possession, the Goldies "were the only ones to use the property during the statutory period."

Regarding notorious possession, the district court cited precedent of this court to the effect that possession is notorious if an occupier's actions on land constitute visible and conspicuous evidence of possession and use of the land. The court found that the Goldies "did not try [to] hide . . . their activit[y]" on the Disputed Property, and the court determined that the Goldies' possession of the Disputed Property "was continuously notorious for a period of at least 10 years."

Regarding adverse possession under a claim of ownership, the district court cited precedent of this court to the effect that such possession is "hostile" in the sense that the claimant "holds and is in possession as owner and therefore against all other claimants of the land" and that possession is manifested in a manner "to give notice to the real owner that his title or ownership is in danger so that he may, within the period of limitations, take action to protect his interest." The court found that the Goldies "occupied the land as owners" in a manner that "constitutes an adverse nature."

The district court addressed the McNeil Companies' affirmative defense that the Goldies' possession of the Disputed

Property was permissive based on the letters sent by Westport Apartments in 1997. The court found that "although most of the owners abutting [the McNeil Property] received the letter via certified mail, having signed a return receipt, [the McNeil Companies] could not produce one signed by [the Goldies]." The court noted Snowden's testimony that she had no physical return receipt card and that she had "only a chart which she prepared listing whether the return receipt was received." The court stated that while the chart indicated that Snowden received a return receipt card from the Goldies, she "testified that she *believes* she got [the Goldies'] return receipt" but that she "does not recall whether it was signed or not." (Emphasis in original.) Noting a conflict in the evidence regarding whether the Goldies received the letters in 1997, the court credited testimony by James and Carol that the Goldies "did not receive the initial letter." The court also found that the "second letter sent to [the Goldies] was returned as 'Unclaimed'" and that the McNeil Companies "took no action to remove any encroachments."

The district court stated that it could not find any Nebraska precedent regarding whether "acknowledgment of permissive use is required to toll the statute of limitations on adverse possession," but that the McNeil Companies "obviously believed that acknowledgment was necessary, or it would not have been requested." The court found that the Goldies "never acknowledged [the McNeil Companies'] superior right to possession of the property" and that instead, the Goldies "at all times acted as owners, doing exactly what they wanted on the disputed property from approximately 1998 to the present." The court concluded that the McNeil Companies' "permissive use defense fails."

Having found that the Goldies proved adverse possession, the district court found that the Disputed Property should be quieted in the Trust. The court set forth a legal description for the Disputed Property and incorporated into the order by reference an "as-built survey" that depicted the

Disputed Property and that had been offered by the Goldies and received into evidence.

The McNeil Companies appeal the district court's order quieting title to the Disputed Property.

## ASSIGNMENTS OF ERROR

The McNeil Companies generally assign that the district court erred in determining that the Goldies adversely possessed the Disputed Property. They specifically assert that the district court erred in finding (1) the Goldies' use of the Disputed Property was notorious and (2) the Goldies' use of the Disputed Property was adverse under a claim of ownership.

## STANDARD OF REVIEW

[1,2] A quiet title action sounds in equity.[1] On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.[2]

[3] In an appeal of an equity action, where credible evidence is in conflict on a material question of fact, an appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and their manner of testifying and accepted one version of the facts rather than another.[3]

## ANALYSIS

[4] The McNeil Companies generally challenge the district court's finding that the Goldies showed adverse possession of the Disputed Property. A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession

---

[1] *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019).

[2] *Id*.

[3] *Id*.

under a claim of ownership for a statutory period of 10 years.[4] The district court found that the Goldies showed all elements by a preponderance of the evidence.

The McNeil Companies do not specifically challenge the district court's findings that the Goldies were in actual, continuous, and exclusive possession of the Disputed Property. Instead, they challenge the district court's findings that the Goldies' possession of the Disputed Property was notorious and that it was adverse under a claim of ownership for the full statutory period of 10 years. We address those two elements below.

## Notorious Possession

[5,6] The McNeil Companies argue that the Goldies did not show that their possession of the Disputed Property was notorious. To be effective against the true owner, acts of dominion over land allegedly adversely possessed must be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another.[5] If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, such will generally be sufficient to establish that possession was notorious.[6]

[7] Although the enclosure of land renders the possession of land open and notorious, and tends to show that it is exclusive, it is not the only way by which possession may be rendered open and notorious.[7] Nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient.[8]

---

[4] *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021).

[5] *Id*.

[6] *Id*.

[7] *Siedlik v. Nissen, supra* note 1.

[8] *Id*.

The McNeil Companies argue that the Goldies' use of the Disputed Property was not notorious because the Goldies did not put up any permanent structures or structures that required footings or that would clearly indicate the Disputed Property was being used by them. The McNeil Companies argue that the Goldies' use amounted to mere maintenance of the Disputed Property. They cite *Poullos v. Pine Crest Homes*,[9] in which we said that acts of routine yard maintenance, without more, are not sufficiently notorious to warn the titleholder that another is claiming or using the land for his or her own purpose and that something more than a neighbor watering and mowing over the property line is needed to alert a reasonable owner that the title is in danger and the owner must take steps to protect his or her interest.

In *Poullos v. Pine Crest Homes*, we found that the plaintiffs failed to prove by a preponderance of the evidence that their possession of the disputed property was sufficiently notorious to support a claim of adverse possession. We stated that before the plaintiffs purchased their land, the prior owner had installed an underground sprinkler system that extended partially onto the neighboring lot and had laid sod that extended partially onto the neighboring lot. We reasoned that while these extensions onto the disputed property were improvements to the land, they were not conspicuous because "[a]butting lawns are ubiquitous in residential neighborhoods,"[10] and we stated that the plaintiffs "made no other visible improvements to the disputed land that might indicate a claim of ownership, such as planting trees or installing a shed, fence, or playset on the land."[11]

In contrast to the plaintiffs in *Poullos v. Pine Crest Homes*, the Goldies' testimony indicates that they did more than mere maintenance of the Disputed Property. When the Goldies

---

[9] *Poullos v. Pine Crest Homes*, 293 Neb. 115, 876 N.W.2d 356 (2016).

[10] *Id.* at 120-21, 876 N.W.2d at 360.

[11] *Id.* at 121, 876 N.W.2d at 360.

moved onto their property, the Disputed Property appeared to be unkept and abandoned. The Goldies cleared the Disputed Property by treating weeds, picking up tree limbs and other debris, and removing certain trees, and they generally prepared the area for their own use by planting grass seed, putting up a fence, doing some landscaping, and building a treehouse. The Goldies thereafter used the Disputed Property for family activities, and in later years, they planted at least one new tree and a garden on the Disputed Property.

While the Goldies performed maintenance activities such as watering and mowing on the Disputed Property, unlike the maintenance activities that we noted in *Poullos v. Pine Crest Homes*, the Goldies' maintenance constituted more than merely watering over the line into a neighbor's property and mowing and maintaining the land in a manner that was indistinguishable from the way abutting portions of the McNeil Property were being maintained. Rather than the ubiquitous abutting lawns we referred to in *Poullos v. Pine Crest Homes*, because of the Goldies' actions to clear, maintain, and use the Disputed Property, the appearance of the Disputed Property presented a visible contrast to the condition of the abutting portions of the McNeil Property, which were not being maintained in the same manner. Based on the testimony and photographic evidence presented by the Goldies, this contrast existed for at least 10 years after the Goldies began to possess the Disputed Property in 1988 or 1989.

The contrast created by the Goldies' actions of clearing, maintaining, and using the Disputed Property supports a finding that their possession was "notorious" under our precedent set forth above. The Goldies' actions in possession of the Disputed Property showed their "intention to appropriate the land to some useful purpose"[12] and constituted "visible and conspicuous evidence of possession and use"[13] of the

---

[12] *Siedlik v. Nissen, supra* note 1, 303 Neb. at 792, 931 N.W.2d at 447.

[13] *Brown v. Morello, supra* note 4, 308 Neb. at 973, 957 N.W.2d at 889.

Disputed Property under the circumstance of this case. In our de novo review, we agree with the district court's finding that the Goldies showed by a preponderance of the evidence that their possession of the Disputed Property was notorious.

### ADVERSE POSSESSION UNDER
### CLAIM OF OWNERSHIP

The McNeil Companies also argue that the Goldies did not show that their possession of the Disputed Property was adverse under a claim of ownership for the statutory period of 10 years. The McNeil Companies focus on their defense that the Goldies' use of the Disputed Property had been permissive since 1997 when Westport Apartments sent letters to the Goldies granting permission to continue their use of the Disputed Property. The McNeil Companies argue that even if the Goldies began an adverse possession of the Disputed Property as early as 1988, the adverse possession ended with the permission granted in 1997 and did not last for the required statutory period of 10 years.

[8,9] A possession that is adverse is under a claim of ownership.[14] Claim of ownership or claim of right means "hostile," and these terms describe the same element of adverse possession.[15] The word "hostile," when applied to the possession of an occupant of real estate holding adversely, is not to be construed as showing ill will, or that the occupant is an enemy of the person holding the legal title, but means an occupant who holds and is in possession as owner and therefore against all other claimants of the land.[16] The purpose of prescribing the manner in which an adverse holding will be manifested is to give notice to the real owner that his or her title or ownership is in danger so that the real owner may,

---

[14] *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998).

[15] *Id*.

[16] *Id*.

within the period of limitations, take action to protect his or her interest.[17] It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he or she takes possession.[18]

[10] When analyzing whether possession is adverse, we have considered whether possession is by permission. We stated in *Wanha v. Long*[19] that permissive use of property can never ripen into title by adverse possession unless there is a change in the nature of possession brought to the attention of the owner in some plain and unequivocal manner that the person in possession is claiming adversely thereby. However, in *Wanha v. Long*, we determined that there was no evidence that any of the owners during the relevant period had given the plaintiffs permission to use the disputed property, and we concluded that the plaintiffs' possession of the disputed property was not permissive and was under a claim of right for the statutory period of at least 10 years.[20]

The Goldies dispute the McNeil Companies' contention that the Goldies' use of the Disputed Property had been permissive since 1997. The Goldies note the district court found that the Goldies never received the letters that purportedly gave them permission to use the Disputed Property and that therefore, they were never given permission.

The Goldies alternatively argue that even if they received permission in 1997, such permission was not given until after their adverse possession of the Disputed Property had begun. The Goldies contend that under Nebraska law, "permission, to be effective, needs to occur prior to the commencement of the possession, not during."[21] The Goldies cite precedent

---

[17] *Id.*

[18] *Id*.

[19] *Id.*

[20] *Id*.

[21] Brief for appellees at 38.

of this court stating that "the evidence shows the original use of these areas to have been permissive"[22] and that "[i]f a use begins as a permissive use, it retains that character until notice that the use is claimed as a matter of right is communicated to the owner of the servient estate."[23] The Goldies argue that because our case law refers to "the original use" of property and "use [that] begins as a permissive use," use of property must begin as permissive for permission to defeat a claim of adverse possession and that permission granted by an owner after adverse possession has begun is not effective to defeat such a claim.

We do not read the cases cited by the Goldies to necessarily require that permission must be given before an adverse possession begins to defeat a claim of adverse possession. Instead, the cases involve fact patterns in which use began as permissive, and the cases address how use that began as permissive might be found to have later turned adverse. Neither party directs us to Nebraska precedent explicitly addressing whether use must be permissive from the beginning to defeat a claim of adverse possession or whether permission given after an adverse possession has begun may defeat such a claim. At least some other states appear to have recognized that permission given after a period of adverse possession has begun may, in appropriate circumstances, defeat a claim of adverse possession.[24] But in this case, we need not decide whether or how permission by an owner may end a period of adverse possession in Nebraska, because we find

---

[22] *Scoville v. Fisher*, 181 Neb. 496, 500, 149 N.W.2d 339, 342 (1967) *abrogated on other grounds, Feloney v. Baye*, 283 Neb. 972, 815 N.W.2d 160 (2012).

[23] *Royal v. McKee*, 298 Neb. 560, 569, 905 N.W.2d 51, 58 (2017).

[24] See, *Jones v. Miles*, 189 N.C. App. 289, 658 S.E.2d 23 (2008); *McKenzie v. Pope*, 33 P.3d 1277 (Colo. App. 2001). See, also, *Zivic v. Place*, 122 N.H. 808, 451 A.2d 960 (1982).

no error in the district court's finding that the Goldies did not receive permission.

The district court found that the Goldies did not receive the letters in 1997 that purportedly granted permission. The court recognized a conflict in the evidence regarding whether the Goldies received the May 1997 letter, with both James and Carol testifying that they never received the letter and the McNeil Companies presenting testimony by Patrick and Snowden that both the May and August 1997 letters had been sent to James. The court found the Goldies' testimony to be more credible and noted that Snowden testified only that, based on her spreadsheet, she believed that James had received the May 1997 letter. The court also noted that Snowden's spreadsheet showed that the August 1997 letter to James had been returned as unclaimed.

In our de novo review, we consider and give weight to the fact that the district court accepted the Goldies' version of the facts rather than the McNeil Companies' version. We agree with the district court's finding that the Goldies did not receive the letters in 1997, and because the McNeil Companies did not point to any evidence that permission was given to the Goldies at any time other than in the 1997 letters, we agree with the district court's rejection of the McNeil Companies' argument that the Goldies' possession of the Disputed Property was or became permissive.

The Goldies also presented evidence that their possession was adverse under a claim of ownership. Carol testified that the Goldies did not have permission from anyone to clear or to use the Disputed Property, that they decided they should "take over" or own the area, and that they "wanted other people to know that that was [their] property and to stay out." In our de novo review, we agree with the district court's finding that the Goldies' possession of the Disputed Property was adverse under a claim of ownership for the statutory period of 10 years.

## CONCLUSION

In our de novo review, we find no error in the district court's specific findings that the Goldies' possession of the Disputed Property was notorious and adverse under a claim of ownership for the statutory period of 10 years or in the district court's general finding that the Goldies showed adverse possession by a preponderance of the evidence. We therefore affirm the district court's order quieting title to the Disputed Property in the Trust.

Affirmed.